# WEEDIN, COMMISSIONER OF IMMIGRATION, *v.* CHIN BOW.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 237.   Argued March 16, 1927.—Decided June 6, 1927.

1. Under Rev. Stats. § 1993, which provides: "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States," citizenship attaches only where the father has resided in the United States before the birth of the child. Pp. 660, 666, 675.

55514°—28——42

2. The section is so legislatively constructed by the Act of March 2, 1907, c. 2534, § 6.  P. 667.

7. F. (2d) 369, reversed.

CERTIORARI (269 U. S. 550) to a judgment of the Circuit Court of Appeals, which affirmed an order of the District Court in *habeas corpus* discharging a Chinese boy, who had applied for admission to the United States and was held for deportation by the immigration authorities.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* and *Mr. Frank M. Parrish,* Attorney in the Department of Justice, were on the brief, for petitioner.

*Mr. Charles E. Hughes,* with whom *Mr. Clement L. Bouvé* was on the brief, for respondent.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a writ of certiorari to review a judgment of the United States Circuit Court of Appeals for the Ninth Circuit affirming an order of the District Court for the Western District of Washington allowing a writ of *habeas corpus* for Chin Bow, a Chinese boy ten years of age, and granting him a discharge.  The petition for certiorari was filed October 29, 1925, and granted December 7, 1925, 269 U. S. 550, under § 240 (a) of the Judicial Code as amended by the Act of February 13, 1925, c. 229, 43 Stat. 936.

Chin Bow applied for admission to the United States at Seattle.  The board of special inquiry of the Immigration Bureau at that place denied him admission on the ground that, though his father is a citizen, he is not a citizen, because at the time of his birth in China his father had never resided in the United States.  Chin Bow was born March 29, 1914, in China.  His father, Chin Dun,

was also born in China, on March 8, 1894, and had never been in this country until July 18, 1922. Chin Dun was the son of Chin Tong, the respondent's grandfather. Chin Tong is forty-nine years old and was born in the United States.

The Secretary of Labor affirmed the decision of the Board of Inquiry, and the deportation of the respondent was ordered. He secured a writ of *habeas corpus* from the District Court. Upon a hearing, an order discharging him was entered without an opinion. On appeal by the United States, the Circuit Court of Appeals affirmed the judgment of the District Court, 7 F. (2d) 369, holding him to be a citizen under the provisions of § 1993 of the Revised Statutes, which is as follows:

"All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States."

The rights of Chin Bow are determined by the construction of this section. The Secretary of Labor, April 27, 1916, asked the opinion of Attorney General Gregory whether a rule of the Chinese regulations of his Department, which denied citizenship to foreign-born children of American Chinese, was a valid one. He advised that it was not, because § 1993 applied to all children and therefore included Chinese children as well. The second question was whether foreign-born children of American-born Chinese fathers were entitled to enter the United States as citizens thereof, when they had continued to reside for some time in China after reaching their majorities, without any affirmative action on their part indicating an intention to remain citizens of the United States; and the Attorney General advised that they were, in spite of

these circumstances, entitled to enter the United States as citizens thereof, 30 Op. A. G. 529.

The United States contends that the proviso of § 1993 "but the rights of citizenship shall not descend to children whose fathers never resided in the United States" must be construed to mean that only the children whose fathers have resided in the United States before their birth become citizens under the section. It is claimed for the respondent that the residence of the father in the United States at any time before his death entitles his son, whenever born, to citizenship. These conflicting claims make the issue to be decided.

The very learned and useful opinion of Mr. Justice Gray, speaking for the Court in *United States* v. *Wong Kim Ark,* 169 U. S. 649, establishes that, at common law in England and the United States, the rule with respect to nationality was that of the *jus soli,*—that birth within the limits of the jurisdiction of the Crown, and of the United States, as the successor of the Crown, fixed nationality, and that there could be no change in this rule of law except by statute; that by the statute of 7 Anne, (1708) c. 5, § 3, extended by the statute of 4 George II, (1731) c. 21, all children born out of the ligeance of the Crown of England whose fathers were or should be natural-born subjects of the Crown of England, or of Great Britain, at the time of the birth of such children respectively, were deemed natural-born subjects of that kingdom to all intents and purposes whatsoever. That statute was extended by the statute of 13 George III, (1773) c. 21, to foreign-born grandchildren of natural-born subjects but not to the issue of such grandchildren (169 U. S. 671). *De Geer* v. *Stone,* 22 Ch. D. 243, 252; Dicey, Conflict of Laws, 178, 781. The latter author says (p. 782) that British nationality did not pass by descent or inheritance beyond the second generation. These statutes applied to the colonies before the War of Independence.

The Act of March 26, 1790, entitled "An Act to estab-
lish an uniform Rule of Naturalization," 1 Stat. 103,
c. 3, came under discussion in February, 1790, in the
House, but the discussion was chiefly directed to naturali-
zation and not to the status of children of American citi-
zens born abroad.   Annals of First Congress, 1109, 1110,
*et seq.*  The only reference is made by Mr. Burke (p.
1121), in which he says:

" The case of the children of American parents born
abroad ought to be provided for, as was done in the case
of English parents in the 12th year of William III.
There are several other cases that ought to be likewise
attended to."

Mr. Hartley said (p. 1125) that he had another clause
ready to present providing for the children of American
citizens born out of the United States.  A select com-
mittee of ten was then appointed to which the bill was
recommitted and from which it was reported.  But no
subsequent reference to the provision of the bill which
we are now considering appears.  The bill as passed was
as follows:

"An Act to establish an uniform Rule of Naturaliza-
tion.

" Sec. 1. Be it enacted by the Senate and House of
Representatives of the United States of America in Con-
gress assembled, That any alien, being a free white per-
son, who shall have resided within the limits and under
the jurisdiction of the United States for the term of two
years, may be admitted to become a citizen thereof, on
application to any common law court of record, in any
one of the states wherein he shall have resided for the
term of one year at least, and making proof to the satis-
faction of such court, that he is a person of good char-
acter, and taking the oath or affirmation prescribed by
law, to support the constitution of the United States,
which oath or affirmation such court shall administer;

and the clerk of such court shall record such application, and the proceedings thereon; and thereupon such person shall be considered as a citizen of the United States. And the children of such persons so naturalized, dwelling within the United States, being under the age of twenty-one years at the time of such naturalization, shall also be considered as citizens of the United States. And the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens: *Provided,* That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States: *Provided also,* That no person heretofore proscribed by any state, shall be admitted a citizen as aforesaid, except by an act of the legislature of the state in which such person was proscribed."

This Act was repealed by the Act of January 29, 1795, 1 Stat. 414, § 4, but the third section of that act reënacted the provisions of the Act of 1790 as to children of citizens born beyond the sea, in equivalent terms. The clauses were not repealed by the next Naturalization Act of June 18, 1798, 1 Stat. 566, but continued in force until the 14th of April, 1802, when an act of Congress of that date, 2 Stat. 153, repealed all preceding acts respecting naturalization. After its provision as to naturalization, it contained in its fourth section the following:

" That the children of persons duly naturalized under any of the laws of the United States, or who, previous to the passing of any law on that subject, by the government of the United States, may have become citizens of any one of the said states, under the laws thereof, being under the age of twenty-one years, at the time of their parents being so naturalized or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered as citizens of the United States, and the children of persons who now are, or have been citizens of the

United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States: *Provided,* that the right of citizenship shall not descend to persons whose fathers have never resided within the United States."

No change was made in the law until 1855. Mr. Horace Binney had written an article, which he published December 1, 1853, for the satisfaction of fellow citizens and friends, whose children were born abroad during occasional visits by their parents to Europe. 169 U. S. 665, 2 Amer. Law Reg. 193. He began the article as follows:

" It does not, probably, occur to the American families who are visiting Europe in great numbers, and remaining there, frequently, for a year or more, that all their children born in a foreign country are aliens, and when they return home, will return under all the disabilities of aliens. Yet this is indisputably the case; for it is not worth while to consider the only exception to this rule that exists under the laws of the United States, viz., the case of a child so born, whose parents were citizens of the United States, on or before the 14th of April, 1802.

" It has been thought expedient, therefore, to call the attention of the public to this state of the laws of the United States, that if there are not some better political reasons for permitting the law so to remain, than the writer is able to imagine, the subject may be noticed in Congress, and a remedy provided."

Mr. Binney demonstrates that, under the law then existing, the children of citizens of the United States born abroad, and whose parents were not citizens of the United States on or before the 14th of April, 1802, were aliens, because the Act of 1802 only applied to such parents, and because, under the common law which applied in this country, the children of citizens born abroad were not citizens but were aliens. Mr. Binney was not interested

in the citizenship of the second generation of children of citizens of the United States born abroad, and nothing in this article was directed to the question of the meaning of the words contained in the Act of 1802, " Provided that the right of citizenship shall not descend to persons whose fathers have never resided within the United States."

The Act of February 10, 1855 (10 Stat. 604), passed presumably because of Mr. Binney's suggestion, was entitled " An Act to secure the right of citizenship to children of citizens of the United States born out of the limits thereof," and read as follows:

" That persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were or shall be at the time of their birth citizens of the United States, shall be deemed and considered and are hereby declared to be citizens of the United States: *Provided however,* That the rights of citizenship shall not descend to persons whose fathers never resided in the United States.

" Sec. 2. That any woman who might lawfully be naturalized under the existing laws, married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen."

The part of the Act of 1855 we are interested in was embodied in the Revised Statutes as § 1993.

It is very clear that the proviso in § 1993 has the same meaning as that which Congress intended to give it in the Act of 1790, except that it was then retrospective, as it was in the Act of 1802, while in the Act of 1855 it was intended to be made prospective as well as retrospective. What was the source of the peculiar words of the proviso there seems to be no way of finding out, as the report of the discussion of the subject is not contained in any publication brought to our attention.   It is evident, how-

ever, from the discussion in the First Congress, already referred to, that there was a strong feeling in favor of the encouragement of naturalization. There were some Congressmen, although they did not prevail, who were in favor of naturalization by the mere application and taking of the oath. The time required for residence to obtain naturalization was finally limited to two years. In the Act of 1795 this was increased to five years, with three years for declaration of intention. Congress must have thought that the questions of naturalization and of the conferring of citizenship on sons of American citizens born abroad were related.

Congress had before it the Act of George III of 1773, which conferred British nationality not only on the children but also on the grandchildren of British-born citizens who were born abroad. Congress was not willing to make so liberal a provision. It was natural that it should wish to restrict the English provision because at the time that this phrase was adopted there were doubtless many foreign-born children of persons who were citizens of the seceding colonies with respect to whose fathers there was a natural doubt whether they intended to claim or enjoy American citizenship or indeed were entitled to it. The last provision of the Act of 1790 manifested this disposition to exclude from the operation of the Act those who were citizens or subjects in the States during the Revolution and had been proscribed by their legislatures. It is not too much to say, therefore, that Congress at that time attached more importance to actual residence in the United States as indicating a basis for citizenship than it did to descent from those who had been born citizens of the colonies or of the states before the Constitution. As said by Mr. Fish, when Secretary of State, to Minister Washburn, June 28, 1873, in speaking of this very proviso, " the heritable blood of citizenship

was thus associated unmistakeably with residence within the country which was thus recognized as essential to full citizenship." Foreign Relations of the United States, Pt. 1, 1873, p. 259. It is in such an atmosphere that we are to interpret the meaning of this peculiarly worded proviso.

Only two constructions seem to us possible, and we must adopt one or the other. The one is that the descent of citizenship shall be regarded as taking place at the birth of the person to whom it is to be transmitted, and that the words "have never been resident in the United States" refer in point of time to the birth of the person to whom the citizenship is to descend. This is the adoption of the rule of *jus sanguinis* in respect of citizenship, and that emphasizes the fact and time of birth as the basis of it. We think the words "the right of citizenship shall not descend to persons whose fathers have never been resident in the United States" are equivalent to saying that fathers may not have the power of transmitting by descent the right of citizenship until they shall become residents in the United States. The other view is that the words "have never been resident in the United States" have reference to the whole life of the father until his death, and therefore that grandchildren of native-born citizens, even after they, having been born abroad, have lived abroad to middle age and without residing at all in the United States, will become citizens, if their fathers, born abroad and living until old age abroad, shall adopt a residence in the United States just before death. We are thus to have two generations of citizens who have been born abroad, lived abroad, the first coming to old age and the second to maturity and bringing up of a family, without any relation to the United States at all until the father shall, in his last days, adopt a new residence. We do not think that such a construction accords with the probable attitude of Congress at the time of the adoption of this proviso into the statute. Its con-

struction extends citizenship to a generation whose birth, minority and majority, whose education, and whose family life, have all been out of the United States and naturally within the civilization and environment of an alien country. The beneficiaries would have evaded the duties and responsibilities of American citizenship. They might be persons likely to become public charges or afflicted with disease, yet they would be entitled to enter as citizens of the United States. Van Dyne, Citizenship of the United States, p. 34.

As between the two interpretations, we feel confident that the first one is more in accord with the views of the First Congress. We think that the proviso has been so construed by a subsequent Act of Congress of March 2, 1907, c. 2534, § 6, 34 Stat. 1229, which provides:

" That all children born outside the limits of the United States who are citizens thereof in accordance with the provisions of section nineteen hundred and ninety-three of the Revised Statutes of the United States and who continue to reside outside the United States shall, in order to receive the protection of this Government, be required upon reaching the age of eighteen years to record at an American consulate their intention to become residents and remain citizens of the United States and shall be further required to take the oath of allegiance to the United States upon attaining their majority."

Now, if this Congress had construed § 1993 to permit the residence prescribed to occur after the birth of such children, we think that it would have employed appropriate words to express such meaning, as for example "All children born who are or may become citizens." The present tense is used, however, indicating that citizenship is determined at the time of birth. Moreover, such foreign-born citizens are required, upon reaching the age of eighteen years, to record their intention to become residents and remain citizens of the United States, and take

the oath of allegiance to the United States upon attaining their majority. If the residence prescribed for the parent may occur after the birth of the children, the father may remain abroad and not reside in the United States until long after such children attain their majority. Thus they could not register or take the oath of allegiance, because the rights of citizenship could not descend to them until their fathers had resided in the United States. This class of foreign-born children of American citizens could not, then, possibly comply with the provisions of the Act of 1907. Nor could such children "remain citizens," since they are expressly denied the rights of citizenship. We may treat the Act of 1907 as being *in pari materia* with the original act, and as a legislative declaration of what Congress in 1907 thought was its meaning in 1790. *United States* v. *Freeman*, 3 How. 556, 564, *et seq.; Cope* v. *Cope*, 137 U. S. 682, 688.

Counsel for the respondent insist that the Act of 1907 is not an act that reflects on the construction to be placed on § 1993; that there is a distinction between citizenship and the enjoyment of it in this country, on the one hand, and the rules that should limit the protection of it abroad by our Government on the other. This may well be conceded. It is illustrated in the opinion of Attorney General Hoar, 13 Op. A. G. 90, in which he advised that even if applicants were citizens they were not entitled to the protection of passports under the circumstances of that case. But we do not think that this distinction detracts from the argumentative weight of the Act of 1907 as a Congressional interpretation of the proviso of 1855, 1802 and 1790.

In answer to the reasons which influence us to the conclusion already indicated, counsel for the respondent say, first, that the hypothesis that the foreign-born fathers and sons may all live abroad from birth to middle age and

bring up families without any association with the United States, and that the sons may then become citizens by the ultimate residence of their fathers in the United States, is not a possible one, because such children must have signified their intention to become citizens when they reached eighteen years of age or at majority at any rate. But these provisions with respect to election of citizenship by those coming to majority were not in the statute when the proviso was enacted, and we must construe it as of 1790 with reference to the views that Congress may be thought to have had at that time.

Then, it is urged that the State Department has held that § 1993 refers only to children and not to adults. This would be a narrow construction of the proviso as it was intended to operate in 1790 when the act was passed, and although this was suggested as a possible view by Secretary of State Bayard, it would limit too much the meaning of the word " children " at a time when no provision had been made by law for election of citizenship by those coming of age. Nor does it seem to be in accord with Attorney General Gregory's opinion already referred to. 30 Op. A. G. 529.

It is said that it would be illogical and unnatural to provide that the father, having begotten children abroad before he lived in the United States at all, and then having gone to the United States and resided there and returned and had more children abroad, should have a family part aliens and part citizens. As this is entirely within the choice of the father, there would seem to be no reason why such a situation should be anomalous. As the father may exercise his option in accordance with the law, so citizenship will follow that option.

Counsel for the respondent, in their learned and thorough brief, have sought to sustain their conclusion in favor of the latitudinarian view of the proviso by many references, all of which we have examined. They point

to. the language of Mr. Justice Gray in delivering the majority opinion in *United States* v. *Wong Kim Ark,* 169 U. S. 649. The majority in that case, as already said, held that the fundamental principle of the common law with regard to nationality was birth within the allegiance of the Government. and that one born in the United States, although of a race and of a parentage denied naturalization under the law, was nevertheless under the language of the Fourteenth Amendment a citizen of the United States by virtue of the *jus soli* embodied in the Amendment. The attitude of Chief Justice Fuller and Mr. Justice Harlan was, that at common law the children of our citizens born abroad were always natural-born citizens from the standpoint of. this Government, and that to that extent the *jus sanguinis* obtained here; that the Fourteenth Amendment did not exclude from citizenship by birth children born in the United States of parents permanently located here who might themselves. become citizens; nor on the other hand did it arbitrarily make. citizens of children born in the United States of adults who according to the will of their native government and of this Government are and must remain aliens. Section 1993 is referred to both in the majority opinion and in the minority opinion. Speaking of the Act of 1855, the majority opinion says (p. 674):

" It thus clearly appears that, during the half century intervening between 1802 and 1855, there was no legislation whatever for the citizenship of children born abroad, during that period, of American parents who had not become citizens of the United States before the act of 1802; and that the act of 1855, like every other act of Congress upon the subject, has, by express proviso, restricted the right of citizenship, thereby conferred upon' foreign-born children of American citizens, to those children themselves, unless they became residents of the United States. Here is nothing to countenance the the-

ory that a general rule of citizenship by blood or descent has displaced in this country the fundamental rule of citizenship by birth within its sovereignty."

The minority opinion said (p. 714):

" Section 1993 of the Revised Statutes provides that children so born ' are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.' Thus a limitation is prescribed on the passage of citizenship by descent beyond the second generation if then surrendered by permanent non-residence, and this limitation was contained in all the acts from 1790 down."

It is very clear that the exact meaning of the proviso upon the point here at issue was not before the Court. The section itself, and the policy of the United States in the sections that preceded it, were important in the discussion only in showing how restricted or otherwise was the application of the *jus sanguinis* in our law. There is nothing in the opinion of the Court that contains an intimation as to what period is covered by the expression " never resided in the United States." We can not regard such a doubtful expression as that of Chief Justice Fuller in his dissent as authoritative in respect to the issue here.

Reference is then made to the very admirable opinion presented by Secretary Fish to President Grant, on July 27, 1868, of the legislation afterwards embodied in the Revised Statutes, §§ 1999, 2000 and 2001, in reference to the right of expatriation, prompted by the Fenian and other international differences, and intended to apply especially to the expatriation of persons coming from European countries to the United States and seeking and receiving naturalization in the United States. U. S. Foreign Relations, 1873, Pt. II, pp. 1191, 1192. President Grant solicited opinions from all of his Cabinet officers. That of Secretary Fish is relied on in this discussion. We do not find it specifically directed to the issue here. It

is rather occupied in a consideration of the point which was then very much mooted, as to what constituted expatriation and what rules should be adopted in determining whether citizens or subjects of other countries coming to the United States were expatriated, and whether, after having been admitted to citizenship, they lost their rights of citizenship by reason of a return to the country of their birth and. a residence there. The only important reference to the proviso of § 1993 is the suggestion by Secretary Fish that the proviso was a recognition by Congress of the right of foreign countries to fix for themselves what constituted allegiance to their country of persons living in their country, without regard to the laws of this country extending citizenship of this country to such persons within their allegiance. Nor do we find anything more definite upon the meaning of the proviso in § 1993 in the letter, already cited, of Secretary Fish to Mr. Washburn under date of June 28, 1873. Foreign Relations of the United States, 1873, Pt. I, p. 256. Reference is also made to the opinion of Attorney General Hoar, already cited, which was rendered to Secretary Fish in a case that did not present this question at all. 13 Op. A. G. 90. The Secretary asked the Attorney General whether four persons residing in the Island of Curacao, for whom application was made for passports, were citizens of the United States and entitled as such to have passports issued to them. They were over twenty-one years of age, and were born in the islands of Curacao. Four of them were children of native citizens of the United States domiciled at Curacao who had not resided in the United States since 1841 (the opinion was given in 1869), and it did not appear affirmatively that any of the applicants had resided or intended to reside in the United States, or that more than one of them had ever been in the country. The At-

torney General expressed the opinion that, if the fathers of the applicants at the time of their birth were citizens of the United States and had " *at some time* " resided within the United States, the applicants were citizens of the United States under the provisions of the statute and entitled to the privileges of citizenship. As their fathers were native-born citizens of the United States, the applicants were probably citizens under § 1993, whether their fathers at any time resided in the United States or not after the time of their birth. The point in the opinion by the Attorney General relied on by respondent's counsel is the intimation that these fathers should have " *at some time* " resided in the United States, without restricting that residence to the time before their birth. The conclusion was that, as these applicants had never been in the United States, there was no obligation to give them passports, even though they were citizens of the United States. We can hardly regard that as a decision upon the point we are considering.

In a work by Mr. Borchard, formerly Assistant Counselor of the State Department, we find this:

" To confer citizenship upon a child born abroad, the father must have resided in the United States. This limitation upon the right of transmitting citizenship indefinitely was intended to prevent the residence abroad of successive generations of persons claiming the privileges of American citizenship while evading its duties. It seems not to have been judicially determined whether the residence of the father in the United States must necessarily have preceded the birth of the child, but by the fact that the statute provides that citizenship shall not ' descend,' it is believed that the residence prescribed must have preceded the birth of the child, and such has been the construction of the Department." Diplomatic Protection of Citizens Abroad, (p. 609).

In his notes under this passage Mr. Borchard correctly points out that while the case of *State* v. *Adams*, 45 Iowa 99, cited for the respondent herein, may have presented facts involving the point we are considering, it was not considered or discussed by the Court.

Mr. Borchard also refers to special consular instructions of the State Department, No. 340, July 27, 1914, entitled "Citizenship of children born of American fathers who have never resided in the United States." These were instructions issued by Mr. Bryan, when Secretary of State, ruling on the question whether residence by the father in Jerusalem, where the United States exercised by treaty extraterritorial powers, was residence within the United States satisfying the requirement of § 1993, and it was held not to be so, reversing former rulings. In these instructions Mr. Bryan indicated his view that foreign-born persons claiming citizenship under § 1993 must fail if their fathers, citizens of the United States, had never resided in the United States when such persons were born, although this was not necessary to the decision he was making.

Mr. Bryan's instructions were based on an opinion of Mr. Cone Johnson, Solicitor of the State Department, printed at pages 41 and 42 of a compilation concerning citizenship issued by the Department in 1925, in which Mr. Johnson suggested that § 1993 might be construed to mean "all children heretofore or hereafter born out of the limits or jurisdiction of the United States whose fathers, having resided in the United States were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States."

Mr. Borchard's statement in his text that the construction of the Department has since been that the residence of the father must have preceded the birth of the child whose American citizenship is claimed, rests on his personal experience and knowledge as an official of the Department and not on any subsequent printed pub-

lication of the Department, to which we have been referred.

It would seem, then, that the question before us is one that has really not been authoritatively decided, except by two Circuit Courts of Appeals, that of the Ninth Circuit, which is here under review, and that of the Circuit Court of Appeals for the First Circuit (*Johnson* v. *Sullivan*, 8 F. (2d) 988) which adopted the view of the Ninth Circuit Court and followed it.

The opinion in the Ninth Circuit says (p. 369):

"The statute refers to the descent of the rights of citizenship. The term 'descend' has a well-defined meaning in law. As defined by Webster, it means: 'To pass down, as from generation to generation, or from ancestor to heir.' If the term 'descend' is given that meaning in this connection, the status of the appellee would not become definitely fixed until his father became a resident of the United States or died without becoming such. In the former event he would become vested with all the rights of citizenship as soon as his father became a resident, while in the latter event his claim to citizenship would be forever lost."

The expression "the rights of citizenship shall descend" can not refer to the time of the death of the father, because that is hardly the time when they do descend. The phrase is borrowed from the law of property. The descent of property comes only after the death of the ancestor. The transmission of right of citizenship is not at the death of the ancestor but at the birth of the child, and it seems to us more natural to infer that the conditions of the descent contained in the limiting proviso, so far as the father is concerned, must be perfected and have been performed at that time.

This leads to a reversal of the judgment of the Circuit Court of Appeals and a remanding of the respondent.

*Reversed.*