**Aldo Mario BELLEI, Plaintiff,**

v.

**Dean RUSK, Secretary of State of the United States of America, Defendant.**

**Civ. A. No. 3002-67.**

United States District Court

District of Columbia.

Feb. 28, 1969.

Milton P. Kroll and Michael I. Smith, Washington, D. C., for plaintiff; O. John Rogge, New York City, admitted pro hac vice, argued and was on brief.

David G. Bress, U. S. Atty., Joseph M. Hannon, and Gil Zimmerman, Asst. U. S. Attys., for defendant; Charles Gordon, Gen. Counsel, Immigration & Naturalization Service, argued and was on brief.

Before WRIGHT and LEVENTHAL, Circuit Judges, and SMITH, District Judge.

LEVENTHAL, Circuit Judge:

Plaintiff, Aldo Mario Bellei, is a citizen of the United States by virtue of section 301(a) (7) of the Immigration and Nationality Act of 1952. That section confers American citizenship on children born of at least one American parent, even though such child is born outside of the United States.[1] Plaintiff brought this action against the Secretary of State to enjoin enforcement of section 301(b) of the 1952 Act, which if operative would terminate his American citizenship. Subsection (b) of § 301 places a limitation on the grant of citizenship made by section 301(a) (7) by making retention of American citizenship conditional upon completing a term of five years residence in the United States before age twenty-eight.[2] We hold that

1. 8 U.S.C. § 1401(a) (7), as amended (Supp. III, 1968):

(a) The following shall be nationals and citizens of the United States at birth:

  \*    \*    \*    \*    \*

(7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other

a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years

  \*    \*    \*.

2. 8 U.S.C. § 1401(b) (1964). This provision requires that such child spend at

this section violates the requirements of the due process clause of the Fifth Amendment.

## I

The pertinent facts have been stipulated. Plaintiff was born in Italy in December, 1939, of an Italian-born father and an American-born mother. Plaintiff's parents have always been and continue to be citizens of their respective native lands.

Plaintiff, from birth, has been treated as an American citizen by the United States Government. He has been welcomed to this country without visas or other immigration papers required of foreigners. He has availed himself of his unlimited access to come to this country on several occasions and to visit with his mother's family. Plaintiff has also traveled at all times under American diplomatic protection. On his first two visits Bellei traveled on his mother's American passport. On the last two occasions when plaintiff visited the United States, he journeyed under his own American passport, which had been issued in 1952 and periodically renewed until 1964. He was subject to the military service laws and he registered for the draft in 1960.[3]

This controversy arises out of the State Department's refusal to extend or renew plaintiff's passport. When plaintiff sought to have his passport renewed in 1964, the Department denied his request. In 1961 the passport renewal office had noted on plaintiff's passport, "Warned abt. 301(b)." Plaintiff, after that warning, sought renewal in January, 1963, stating in his application that he resided in Havertown, Pennsylvania, giving his occupation as student, and indicating that he intended to remain abroad only three months. His application was granted, but the passport was validated only through July, 1963. At the time of this renewal plaintiff was twenty-three years old.

In July, 1963, plaintiff applied through the United States Embassy in Italy for a further extension. Again his request was honored, but he was reminded that he would no longer be considered a citizen, in view of section 301(b), if he remained abroad. The extension expired as of February 11, 1964. When plaintiff failed to return to this country prior to that date, the Department of State concluded that he was no longer a United States citizen, and he was orally informed of that conclusion by the American Embassy at Rome. His passport was accordingly deemed revoked. On February 14, plaintiff was also notified by the United States Selective Service that his liability for military service had terminated in view of his loss of citizenship. At that time plaintiff was over twenty-four years of age. Since 1964,

---

least five years in this country between the ages of fourteen and twenty-eight:

(b) Any person who is a national and citizen of the United States at birth under pargraph (7) of subsection (a) of this section, shall lose his nationality and citizenship unless he shall come to the United States prior to attaining the age of twenty-three years and shall immediately following any such coming be continuously physically present in the United State [sic] for at least five years: *Provided*, That such physical presence follows the attainment of the age of fourteen years and precedes the age of twenty-eight years.

The "continuous" presence requirement of section 1401(b) was liberalized in 1957, 71 Stat. 644 (1957), 8 U.S.C. 1401b (1964):

In the administration of section 1401(b) of this title, absences from the United States of less than twelve months in the aggregate, during the period for which continuous physical presence in the United States is required, shall not be considered to break the continuity of such physical presence.

When Congress originally included this requirement in 1934, it required five years residence before the child reached age eighteen. *See* 48 Stat. 797. The 1940 reenactment was more generous, *see* 54 Stat. 1138–1139, and the present law is even less strict, allowing the child until age twenty-eight to complete his five years of residence.

3. His scheduled induction in 1963 was deferred because of his employment with a NATO defense program.

plaintiff has again applied for an American passport and has had his request turned down by a formal letter from the American consul in Italy.[4]

Plaintiff contends that enforcement of section 301(b) is contrary to the Fifth, Eighth, and Ninth Amendments to the Constitution. A three-judge court has been convened since the constitutionality of a federal law is drawn into question by this litigation.[5]

## II

Plaintiff contends that section 301(b) operates to strip a citizen of his citizenship and rests his case primarily on the pillar of due process which has become a bulwark for the protection of citizenship in recent Supreme Court decisions. See Afroyim v. Rusk, 387 U.S. 253, 87 S. Ct. 1660, 18 L.Ed.2d 757 (1967); Schneider v. Rusk, 377 U.S. 163, 84 S. Ct. 1187, 12 L.Ed.2d 218 (1964). While the facts of both cases are distinguishable, we think the *Afroyim* and *Schneider* opinions do stand for the proposition that in the absence of fraud Congress may not withdraw a citizenship, whether acquired at birth or by subsequent grant, that is not voluntarily renounced.[6] The position urged by the Government would require us to accord a "niggardly" reading that we think is incompatible with the broad and forceful position put forward by the Supreme Court to protect an important constitutional right. Cf. Ullmann v. United States, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

We turn first to Schneider v. Rusk, *supra*.[7] That case involved a statutory provision which provided:

(a) A person who has become a national by naturalization shall lose his nationality by—

(1) having a continuous residence for three years in the territory of a foreign state of which he was formerly a national or in which the place of his birth is situated, except as provided in section 353 of this title, whether such residence commenced before or after the effective date of this Act * * *. Section 352, Immigration and Nationality Act of 1952, 66 Stat. 163, 269, 8 U.S.C. §§ 1101, 1484.

In holding that Congress could not constitutionally restrict the freedom of naturalized citizens to reside abroad in their native lands the Court said:

A native-born citizen is free to reside abroad indefinitely without suffering loss of citizenship. The discrimination aimed at naturalized citizens drastically limits their rights to live and work abroad in a way that other citizens may. It creates indeed a second-class citizenship. Living abroad, whether the citizen be naturalized or native born, is no badge of lack of allegiance and in no way evidences a voluntary renunciation of nationality and allegiance. It may indeed be compelled by family, business, or other legitimate reasons. 377 U.S. at 168–169, 84 S.Ct. at 1190.[8]

---

4. We reproduce here the letter from the American consul:
   In reply to your verbal request for the issuance of an American passport in your name, your request is hereby denied since you no longer hold American nationality. This action is based on an instruction from the Department of State to this Embassy on September 1, 1964, in which the Department held that you had lost American nationality as of February 12, 1964, by your failure to be physically present in the United States for a period of five years between your fourteenth and twentythird [sic] birthdays, as required by Section 301(b) of the Immigration and Nationality Act as amended by

Section 16 of the Act approved on September 11, 1957.

5. 28 U.S.C. § 2282 (1964).

6. The exception for the person who has required his citizenship by fraud is noted in Afroyim v. Rusk, 387 U.S. 253, 267 n. 23, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967).

7. 377 U.S. 163, 84 S.Ct. 1187 (1964).

8. *Compare* the 1940 enactment, 54 Stat. 1139, of what is now section 301, dropped over protest in 1952 (*see* 98 Cong.Rec. 5785, 82d Cong., 2d Sess. 1952), providing specially for children whose American parent was engaged abroad on American-related business.

The Supreme Court's broad approach emerged even more clearly with Afroyim v. Rusk,[9] where the Court held that Congress could not take away citizenship from one who has not voluntarily relinquished it. The significance of *Afroyim* is illuminated by the fact that previously, following Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), the Court had, in Justice Black's words "consistently invalidated on a case-by-case basis various other statutory sections providing for involuntary expatriation. It has done so on various grounds and has refused to hold that citizens can be expatriated without their voluntary renunciation of citizenship." In *Afroyim* the Court overruled *Perez*, discarded the case-by-case approach, and sounded a general theme that was contrary to the previously stated assumption that Congress had the power to expatriate citizens in certain circumstances.

> Citizenship is no light trifle * * *. The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship. We hold that the Fourteenth Amendment was designed to, and does, protect *every* citizen of this Nation against forcible destruction of his citizenship, whatever his creed, color, or race. Our holding does no more than to give to this citizen that which is his own, a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship. 387 U.S.

at 267–268, 87 S.Ct. at 1668. (Emphasis added.)

Section 301(a) (7) by its terms confers citizenship at birth.[10] Persons in plaintiff's situation are endowed at birth with American citizenship and all its incidents and they enjoy its benefits during their formative years. The provisions of subsection (b) would operate to terminate the citizenship status for those persons, previously recognized as citizens, who do not take the steps set forth in (b). While plaintiff did not take up residence in this country in 1963, as provided by section 301(b), he had declared his intention to do so. During this period of citizenship, he was subject to American jurisdiction as a citizen[11] and also subject to other duties of citizenship such as military service. Now he is independent of youthful ties to family and wants to come to the United States. In view of the prior grant of citizenship to plaintiff we do not think Congress can now slam the door in his face. Whatever the reason plaintiff remained abroad, family ties or schooling, Congress cannot terminate his citizenship on the ground that he only enjoyed a second-class citizenship, one that restricted his "rights to live and work abroad in a way that other citizens may." This is contrary to *Schneider* and *Afroyim*.

### III

The Government relies on the fact that *Schneider* and *Afroyim* protected plaintiffs who traced their citizenship to naturalization. It is argued that the Fourteenth Amendment's due process

---

9. 387 U.S. 253, 87 S.Ct. 1660 (1967).

10. The predecessor to section 301, § 1993 Revised Statutes, left open the question of whether the child beneficiary acquired citizenship at birth, or only upon compliance with conditions of declaring an intention to become a resident and taking an oath of allegiance required by section 6, Act of March 2, 1907, 34 Stat. 1228, 1229. The 1934 Act substituted the requirement of presence in the United States which is the forerunner of subsection (b). While the floor debates on the 1934 Act suggested that it was necessary to comply with the requirements of residence before citizenship could attach, the Attorney General in a contemporaneous construction concluded that the Act conferred citizenship at birth. *See* 38 Ops. Atty. Gen. 10, 16–18 (1934); *see also* Weedin v. Chin Bow, 274 U.S. 657, 675, 47 S.Ct. 772, 71 L.Ed. 1284 (1927), concluding, by implication, that the benefit of citizenship under the 1855 Act attached at birth.

11. Blackmer v. United States, 281 U.S. 421, 432, 52 S.Ct. 252, 76 L.Ed. 375 (1932).

clause guards only that citizenship that is constitutionally conferred, citizenship acquired by birth in the United States or by naturalization, and is inapplicable to citizenship conferred by a statute that is not an act of naturalization. We see no basis for the distinction. It may be that there is more than one Constitutional source of Congressional authority to grant and define citizenship, that there is power deriving from the naturalization clause, Act I, § 8, cl. 4, and also authority[12] deriving from implied powers of Congress.[13] In any event, however, the recognition or grant of U. S. citizenship is lawful only because this is within the power of Congress under the Constitution.

We see no basis for concluding that the Supreme Court was declaring a due process protection to citizenship granted by a naturalization act that did not extend to citizenship granted by another act.[14]

The Government argues in the alternative that even if congressional power to enact conditions on citizenship is limited by due process, section 301(b) contains reasonable conditions and is, therefore, constitutional. It is urged that section 301(b) is simply a reasonable way of assuring that children of hybrid origin give some affirmative indication of desiring to be part of our society as well as avail themselves of our protection and the opportunity to come to this country whenever it proves expedient.[15] Our attention is directed to the background and legislative history of section 301 which, according to the Government, reveals

12. What appears to be the earliest ancestor of section 301(a) is the Act of March 26, 1790, 1 Stat. 103, 104, which was an Act to establish a uniform rule of naturalization. *See* n. 16, infra.

13. Article I, § 8 authorizes Congress "to establish an uniform Rule of Naturalization." We need not here decide whether there exists an implied power in foreign relations that would justify legislation like that before us. *See* Henkin, The Treaty Makers and the Law Makers: The Law of the Land and Foreign Relations, 107 U.Pa.L.Rev. 903 (1959). Other possibilities exist for justifying congressional legislation to define citizenship. The term "naturalization" appears in the text of the Constitution without definition. The need for explication may well serve to sustain legislation. *Compare* Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

14. We do not think a contrary view was intended by Justice Black's majority opinion in *Afroyim*, that

the [Fourteenth] Amendment can most reasonably be read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it. Once acquired, this Fourteenth Amendment citizenship was not to be shifted, canceled, or diluted at the will of the Federal Government, the States, or any other governmental unit. 387 U.S. at 262, 87 S.Ct. at 1665.

*See also* Justice Warren's dissent in Perez v. Brownell:

The Government is without power to take citizenship away from a native-born or lawfully naturalized American. The Fourteenth Amendment recognizes that this priceless right is immune from the exercise of arbitrary governmental powers.

356 U.S. at 77–78, 78 S.Ct. at 586.

It is hardly consistent with the far-reaching holding of *Afroyim* to attribute to Justice Black's language an intention to leave unprotected a broad class of citizens. The holding is case in broad terms and draws no distinction among types of citizenship. *See* Afroyim v. Rusk, 387 U.S. at 267–268, 87 S.Ct. at 1668. Moreover, there is no reason to believe that Justice Black meant to vary settled doctrine that due process protects persons.

15. *Compare* Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320 (1939), approving by implication an election requirement for persons who bear dual citizenship; *see also* Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950), holding that voluntary naturalization in a foreign state is a valid basis for expatriating an American citizen, even though there was no desire or intention or awareness that the act of naturalization would operate to divest citizenship. For a discussion of problems arising out of dual nationality, *see generally* Scharf, A Study of the Law of Expatriation, 38 St. Johns L.Rev. 251, 271–75 (1964).

that the purpose of subsection (b) of § ·301 is to assure that these children of mixed allegiance have some connection to the state that is offering them its protection and other benefits of citizenship.[16]

The Government's contention is not without appeal; and we have pondered the matter carefully. There is an undeniable danger that children, born and raised abroad, in a foreign home, where English may never be spoken, schooled where English is not taught, celebrating foreign holidays with the family of the non-American parent, will have no meaningful connection with the United States, its culture or heritage. It is a legitimate concern of Congress that those who bear American citizenship and receive its benefits have some nexus to the United States.[17] We hold only that Congress may not proceed by granting citizenship, and then either qualifying the grant by creating a second class citizenship or terminating the grant.[18] The broad teaching of *Afroyim* and *Schneider* is that once American citizenship has been recognized or conferred, Congress may not remove the status; it is for the citizen to abandon his citizenship voluntarily.

Plaintiff's motion for summary judgment is granted: defendant's cross-motion is denied.

LEVENTHAL, Circuit Judge (concurring):

I add to the opinion I have written for the court a few words that help me place this case in perspective.

16. Section 301 can be traced to early legislation, dating back to the infancy of the Republic. As early as 1790 Congress provided for the transmission of citizenship by descent. The first such statute was framed as a limitation. "[T]he right of citizenship shall not descend to persons whose fathers have never been resident in the United States." Section 1, Act of March 26, 1790, 1 Stat. 103, 104. That section was reenacted and finally codified as § 1993 of Revised Statutes. The 1855 Act was a response to an 1854 article, criticizing the earlier formulations for not providing citizenship for those children of American paternity who were born abroad. *See* Binney, 2 Amer. Law Reg. 193; *see also* 2 Kent Commentaries 14. In 1934 Congress eliminated the obvious inequity of extending the benefit of citizenship to only those children with paternal ties to the United States. *See* 78 Cong.Rec. 7344 (73rd Cong., 2d Sess.). At this juncture Congress also included the five years presence requirement which is now section (b) of the statute. Sec. 1, Act of May 24, 1934, 48 Stat. 797.

The forerunner of subsection (b) was Section 6, Act of March 2, 1907, 34 Stat. 1228–1229, which provided:

That all children born outside the limits of the United States who are citizens thereof in accordance with the provisions of section nineteen hundred and ninety-three of the Revised Statutes of the United States and who continue to reside outside the United States shall, in order to receive the protection of this Government, be required upon reaching the age of eighteen years to record at an American consulate their intention to become residents and remain citizens of the United States and shall be further required to take the oath of allegiance to the United States upon attaining their majority.

17. We recognize that "jus sanguinis" may provide a tenuous link to the national state when citizenship is conferred by virtue of the citizenship of only one parent. Yet we are not confronted with the specter of generations of child emigres who will return to this country to claim citizenship. Section 301(a) (7) itself requires that a parent have lived in the United States ten years as a prerequisite to transmitting citizenship to a foreign-born child.

18. After argument was heard in this case the Attorney General promulgated a Department ruling setting forth the procedure that would be followed in expatriation cases after Afroyim v. Rusk. The gist of the memorandum is that each case will be taken on an individual basis to ascertain whether the individual involved actually intended to relinquish his American citizenship, assuming he puts the question of intent at issue. Since the new procedure "does not necessarily apply to the loss of U. S. citizenship acquired as a result of birth abroad to a citizen parent or parents," we have no occasion to consider the legal significance or soundness of the Department ruling, which appears at 34 Fed.Reg. 1079 (January 23, 1969).

We did not have before us in this case a statute that set conditions as a prerequisite for the grant of citizenship. Therefore we did not have occasion to consider to what extent Congress could impose such conditions and what kind of conditions, if any, it could impose. My own assumption is that Congress can impose reasonable conditions that must be met before citizenship is recognized.[1] But that is not the course that Congress wanted to follow here. It wanted the child beneficiary governed by § 301(a) (7) to be a citizen at birth, with advantages of United States diplomatic protection and other benefits of citizenship, and perhaps with the corollary opportunity to resist citizenship claims of other countries.[2]

Nor were we required to consider a statute in which residence abroad was not established as an operative fact terminating citizenship, but was given significance only as an evidentiary fact indicative of a voluntary relinquishment of citizenship.[3]

John **TOOTALIAN**, Plaintiff,

v.

**Wilbur J. COHEN, Secretary of Health, Education and Welfare, Defendant.**

**No. C 68–270.**

United States District Court
N. D. Ohio, E. D.
Dec. 20, 1968.

Gerald J. Celebrezze, Cleveland, Ohio, for plaintiff.

1. While Congress would have wide latitude in drafting a condition precedent to its grant of citizenship, such conditions would have to comply with the fundamental requirements of equal protection and due process. *Compare* French, Unconstitutional Conditions: An Analysis, 50 Geo. L.J. 234 (1961).

2. *See* Borchard, Diplomatic Protection of Citizens Abroad § 200, at 462.

3. *Compare* Chief Justice Warren's dissent in Perez v. Brownell, which states that "certain voluntary conduct results in an impairment of the status of citizenship," 356 U.S. at 69, 78 S.Ct. at 581, and that

Bernard Stuplinski, U. S. Atty., through Harry E. Pickering, Asst. U. S. Atty., for defendant.

"United States citizenship can be abandoned, temporarily or permanently, by conduct showing a voluntary transfer of allegiance to another country." 356 U.S. at 73, 78 S.Ct. at 583; *compare also* Justice Black's concurring opinion in Nishikawa v. Dulles, 356 U.S. 129, 139, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958), where he noted, "Although Congress may provide rules of evidence for [determining when there has been voluntary relinquishment], it cannot declare that such equivocal acts as service in a foreign army, participation in a foreign election or desertion from our armed forces, establish a conclusive presumption of intention to throw off American nationality. [Citation omitted.] Of course such conduct may be highly persuasive evidence in the particular case of a purpose to abandon citizenship."