ROGERS, SECRETARY OF STATE *v.* BELLEI

No. 24.   Argued January 15, 1970—Reargued November 12, 1970—
Decided April 5, 1971

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, and WHITE, JJ., joined. BLACK, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post,* p. 836. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post,* p. 845.

*Solicitor General Griswold* argued the cause for appellant on the reargument.   With him on the brief were *Assistant Attorney General Wilson* and *Charles Gordon. Joseph J. Connolly* argued the cause for appellant on the original argument.

*O. John Rogge* reargued the cause and filed a brief for appellee.

*Richard N. Gardner* argued the cause on the reargument for the Association of American Wives of Europeans

et al. as *amici curiae* urging affirmance. With him on the brief were *Alexis C. Coudert, Eugene L. Girden, Joseph H. Gordon, David M. Gooder,* and *Arlene Tuck Ulman.*

James Sinclair, *pro se,* filed a brief as *amicus curiae* urging reversal.

*Donald L. Ungar* filed a brief for Vicente Gonzalez-Gomez as *amicus curiae* urging affirmance.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Under constitutional challenge here, primarily on Fifth Amendment due process grounds, but also on Fourteenth Amendment grounds, is § 301 (b) of the Immigration and Nationality Act of June 27, 1952, 66 Stat. 236, 8 U. S. C. § 1401 (b).

Section 301 (a) of the Act, 8 U. S. C. § 1401 (a), defines those persons who "shall be nationals and citizens of the United States at birth." Paragraph (7) of § 301 (a) includes in that definition a person born abroad "of parents one of whom is an alien, and the other a citizen of the United States" who has met specified conditions of residence in this country. Section 301 (b), however, provides that one who is a citizen at birth under § 301 (a)(7) shall lose his citizenship unless, after age 14 and before age 28, he shall come to the United States and be physically present here continuously for at least five years. We quote the statute in the margin.[1]

---

[1] "SEC. 301. (a) The following shall be nationals and citizens of the United States at birth:

"(1) a person born in the United States, and subject to the jurisdiction thereof;

. . . . .

"(7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to

The plan thus adopted by Congress with respect to a person of this classification was to bestow citizenship at birth but to take it away upon the person's failure to comply with a post-age-14 and pre-age-28 residential requirement. It is this deprival of citizenship, once bestowed, that is under attack here.

## I

The facts are stipulated:

1. The appellee, Aldo Mario Bellei (hereinafter the plaintiff), was born in Italy on December 22, 1939. He is now 31 years of age.

2. The plaintiff's father has always been a citizen of Italy and never has acquired United States citizenship. The plaintiff's mother, however, was born in Philadelphia in 1915 and thus was a native-born United States citizen. She has retained that citizenship. Moreover, she has fulfilled the requirement of § 301 (a)(7) for physical pres-

the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years: *Provided . . . .*

"(b) Any person who is a national and citizen of the United States at birth under paragraph (7) of subsection (a), shall lose his nationality and citizenship unless he shall come to the United States prior to attaining the age of twenty-three years and shall immediately following any such coming be continuously physically present in the United State[s] for at least five years: *Provided,* That such physical presence follows the attainment of the age of fourteen years and precedes the age of twenty-eight years.

"(c) Subsection (b) shall apply to a person born abroad subsequent to May 24, 1934 . . . ."

Section 301 (a)(7) was amended November 6, 1966, by Pub. L. 89–770, 80 Stat. 1322, by way of additions to the proviso, omitted above; these have no relevancy here. Pub. L. 85–316, § 16, 71 Stat. 644, 8 U. S. C. § 1401b, enacted in September 1957, provides that absences of less than 12 months in the aggregate "shall not be considered to break the continuity of [the] physical presence" required by § 301 (b).

ence in the United States for 10 years, more than five of which were after she attained the age of 14 years. The mother and father were married in Philadelphia on the mother's 24th birthday, March 14, 1939. Nine days later, on March 23, the newlyweds departed for Italy. They have resided there ever since.

3. By Italian law the plaintiff acquired Italian citizenship upon his birth in Italy. He retains that citizenship. He also acquired United States citizenship at his birth under Rev. Stat. § 1993, as amended by the Act of May 24, 1934, § 1, 48 Stat. 797, then in effect.[2] That version of the statute, as does the present one, contained a residence condition applicable to a child born abroad with one alien parent.

4. The plaintiff resided in Italy from the time of his birth until recently. He currently resides in England, where he has employment as an electronics engineer with an organization engaged in the NATO defense program.

5. The plaintiff has come to the United States five different times. He was physically present here during the following periods:

April 27 to July 31, 1948
July 10 to October 5, 1951
June to October 1955

---

[2] "Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend to any such child unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child. In cases where one of the parents is an alien, the right of citizenship shall not descend unless the child comes to the United States and resides therein for at least five years continuously immediately previous to his eighteenth birthday, and unless, within six months after the child's twenty-first birthday, he or she shall take an oath of allegiance to the United States of America as prescribed by the Bureau of Naturalization."

December 18, 1962 to February 13, 1963
May 26 to June 13, 1965.

On the first two occasions, when the plaintiff was a boy of eight and 11, he entered the country with his mother on her United States passport. On the next two occasions, when he was 15 and just under 23, he entered on his own United States passport and was admitted as a citizen of this country. His passport was first issued on June 27, 1952. His last application approval, in August 1961, contains the notation "Warned abt. 301 (b)." The plaintiff's United States passport was periodically approved to and including December 22, 1962, his 23d birthday.

6. On his fifth visit to the United States, in 1965, the plaintiff entered with an Italian passport and as an alien visitor. He had just been married and he came with his bride to visit his maternal grandparents.

7. The plaintiff was warned in writing by United States authorities of the impact of § 301 (b) when he was in this country in January 1963 and again in November of that year when he was in Italy. Sometime after February 11, 1964, he was orally advised by the American Embassy at Rome that he had lost his United States citizenship pursuant to § 301 (b). In November 1966 he was so notified in writing by the American Consul in Rome when the plaintiff requested another American passport.

8. On March 28, 1960, plaintiff registered under the United States Selective Service laws with the American Consul in Rome. At that time he already was 20 years of age. He took in Italy, and passed, a United States Army physical examination. On December 11, 1963, he was asked to report for induction in the District of Columbia. This induction, however, was then deferred because of his NATO defense program employment. At the time of deferment he was warned of the danger of losing his United States citizenship if he did not comply

with the residence requirement. After February 14, 1964, Selective Service advised him by letter that, due to the loss of his citizenship, he had no further obligation for United States military service.

Plaintiff thus concededly failed to comply with the conditions imposed by § 301 (b) of the Act.

## II

The plaintiff instituted the present action against the Secretary of State in the Southern District of New York. He asked that the Secretary be enjoined from carrying out and enforcing § 301 (b), and also requested a declaratory judgment that § 301 (b) is unconstitutional as violative of the Fifth Amendment's Due Process Clause, the Eighth Amendment's Punishment Clause, and the Ninth Amendment, and that he is and always has been a native-born United States citizen. Because, under 28 U. S. C. § 1391 (e), the New York venue was improper, the case was transferred to the District of Columbia. 28 U. S. C. § 1406 (a).

A three-judge District Court was convened. With the facts stipulated, cross motions for summary judgment were filed. The District Court ruled that § 301 (b) was unconstitutional, citing *Afroyim* v. *Rusk,* 387 U. S. 253 (1967), and *Schneider* v. *Rusk,* 377 U. S. 163 (1964), and sustained the plaintiff's summary judgment motion. *Bellei* v. *Rusk,* 296 F. Supp. 1247 (DC 1969). This Court noted probable jurisdiction, 396 U. S. 811 (1969), and, after argument at the 1969 Term, restored the case to the calendar for reargument. 397 U. S. 1060 (1970).

## III

The two cases primarily relied upon by the three-judge District Court are, of course, of particular significance here.

*Schneider* v. *Rusk,* 377 U. S. 163 (1964). Mrs. Schneider, a German national by birth, acquired United States citizenship derivatively through her mother's naturalization in the United States. She came to this country as a small child with her parents and remained here until she finished college. She then went abroad for graduate work, was engaged to a German national, married in Germany, and stayed in residence there. She declared that she had no intention of returning to the United States. In 1959, a passport was denied by the State Department on the ground that she had lost her United States citizenship under the specific provisions of § 352 (a)(1) of the Immigration and Nationality Act, 8 U. S. C. § 1484 (a)(1), by continuous residence for three years in a foreign state of which she was formerly a national. The Court, by a five-to-three vote, held the statute violative of Fifth Amendment due process because there was no like restriction against foreign residence by native-born citizens.

The dissent (Mr. Justice Clark, joined by JUSTICES HARLAN and WHITE) based its position on what it regarded as the long acceptance of expatriating naturalized citizens who voluntarily return to residence in their native lands; possible international complications; past decisions approving the power of Congress to enact statutes of that type; and the Constitution's distinctions between native-born and naturalized citizens.

*Afroyim* v. *Rusk,* 387 U. S. 253 (1967). Mr. Afroyim, a Polish national by birth, immigrated to the United States at age 19 and after 14 years here acquired United States citizenship by naturalization. Twenty-four years later he went to Israel and voted in a political election there. In 1960 a passport was denied him by the State Department on the ground that he had lost his United States citizenship under the specific provisions of § 349 (a)(5) of the Act, 8 U. S. C. § 1481 (a)(5), by

his foreign voting. The Court, by a five-to-four vote, held that the Fourteenth Amendment's definition of citizenship was significant; that Congress has no "general power, express or implied, to take away an American citizen's citizenship without his assent," 387 U. S., at 257; that Congress' power is to provide a uniform rule of naturalization and, when once exercised with respect to the individual, is exhausted, citing Mr. Chief Justice Marshall's well-known but not uncontroversial dictum in *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 827 (1824); and that the "undeniable purpose" of the Fourteenth Amendment was to make the recently conferred "citizenship of Negroes permanent and secure" and "to put citizenship beyond the power of any governmental unit to destroy," 387 U. S., at 263. *Perez* v. *Brownell,* 356 U. S. 44 (1958), a five-to-four holding within the decade and precisely to the opposite effect, was overruled.

The dissent (MR. JUSTICE HARLAN, joined by JUSTICES Clark, STEWART, and WHITE) took issue with the Court's claim of support in the legislative history, would elucidate the Marshall dictum, and observed that the adoption of the Fourteenth Amendment did not deprive Congress of the power to expatriate on permissible grounds consistent with "other relevant commands" of the Constitution. 387 U. S., at 292.

It is to be observed that both Mrs. Schneider and Mr. Afroyim had resided in this country for years. Each had acquired United States citizenship here by the naturalization process (in one case derivative and in the other direct) prescribed by the National Legislature. Each, in short, was covered explicitly by the Fourteenth Amendment's very first sentence: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." This, of course, ac-

counts for the Court's emphasis in *Afroyim* upon "Fourteenth Amendment citizenship." 387 U. S., at 262.

## IV

The statutes culminating in § 301 merit review:

1. The very first Congress, at its Second Session, proceeded to implement its power, under the Constitution's Art. I, § 8, cl. 4, to "establish an uniform Rule of Naturalization" by producing the Act of March 26, 1790, 1 Stat. 103. That statute, among other things, stated, "And the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens: *Provided,* That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States . . . ."

2. A like provision, with only minor changes in phrasing and with the same emphasis on paternal residence, was continuously in effect through three succeeding naturalization Acts. Act of January 29, 1795, § 3, 1 Stat. 415; Act of April 14, 1802, § 4, 2 Stat. 155; Act of February 10, 1855, c. 71, § 1, 10 Stat. 604. The only significant difference is that the 1790, 1795, and 1802 Acts read retrospectively, while the 1855 Act reads prospectively as well. See *Weedin* v. *Chin Bow,* 274 U. S. 657, 664 (1927), and *Montana* v. *Kennedy,* 366 U. S. 308, 311 (1961).

3. Section 1 of the 1855 Act, with changes unimportant here, was embodied as § 1993 of the Revised Statutes of 1874.[3]

---

[3] "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States."

4. The Act of March 2, 1907, § 6, 34 Stat. 1229, provided that all children born abroad who were citizens under Rev. Stat. § 1993 and who continued to reside elsewhere, in order to receive governmental protection, were to record at age 18 their intention to become residents and remain citizens of the United States and were to take the oath of allegiance upon attaining their majority.[4]

5. The change in § 1993 effected by the Act of May 24, 1934, is reflected in n. 2, *supra*. This eliminated the theretofore imposed restriction to the paternal parent and prospectively granted citizenship, subject to a five-year continuous residence requirement and an oath, to the foreign-born child of either a citizen father or a citizen mother. This was the form of the statute at the time of plaintiff's birth on December 22, 1939.

6. The Nationality Act of 1940, § 201, 54 Stat. 1138, contained a similar condition directed to a total of five years' residence in the United States between the ages of 13 and 21.[5]

---

[4] "That all children born outside the limits of the United States who are citizens thereof in accordance with the provisions of section nineteen hundred and ninety-three of the Revised Statutes of the United States and who continue to reside outside the United States shall, in order to receive the protection of this Government, be required upon reaching the age of eighteen years to record at an American consulate their intention to become residents and remain citizens of the United States and shall be further required to take the oath of allegiance to the United States upon attaining their majority."

[5] SEC. 201. The following shall be nationals and citizens of the United States at birth:

.　　　.　　　　.　　　　.　　　　.

"(g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years,

7. The Immigration and Nationality Act, by its § 407, 66 Stat. 281, became law in December 1952. Its § 301 (b) contains a five years' continuous residence condition (alleviated, with the 1957 amendment, see n. 1, by an allowance for absences less than 12 months in the aggregate) directed to the period between 14 and 28 years of age.

The statutory pattern, therefore, developed and expanded from (a) one, established in 1790 and enduring through the Revised Statutes and until 1934, where citizenship was specifically denied to the child born abroad of a father who never resided in the United States; to (b), in 1907, a governmental protection condition for the child born of an American citizen father and residing abroad, dependent upon a declaration of intent and the oath of allegiance at majority; to (c), in 1934, a condition, for the child born abroad of one United States citizen parent and one alien parent, of five years' continuous residence in the United States before age 18 and the oath of allegiance within six months after majority; to (d), in 1940, a condition, for that child, of five years' residence here, not necessarily continuous, between ages 13 and 21; to (e), in 1952, a condition,

the other being an alien: *Provided,* That in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: *Provided further,* That, if the child has not taken up a residence in the United States or its outlying possessions by the time he reaches the age of sixteen years, or if he resides abroad for such a time that it becomes impossible for him to complete the five years' residence in the United States or its outlying possessions before reaching the age of twenty-one years, his American citizenship shall thereupon cease.

.    .    .    .    .

"(h) The foregoing provisions of subsection (g) concerning retention of citizenship shall apply to a child born abroad subsequent to May 24, 1934."

for that child, of five years' continuous residence here, with allowance, between ages 14 and 28.

The application of these respective statutes to a person in plaintiff Bellei's position produces the following results:

1. Not until 1934 would that person have had any conceivable claim to United States citizenship. For more than a century and a half no statute was of assistance. Maternal citizenship afforded no benefit. One may observe, too, that if Mr. Bellei had been born in 1933, instead of in 1939, he would have no claim even today. *Montana* v. *Kennedy, supra.*

2. Despite the recognition of the maternal root by the 1934 amendment, in effect at the time of plaintiff's birth, and despite the continuing liberalization of the succeeding statutes, the plaintiff still would not be entitled to full citizenship because, although his mother met the condition for her residence in the United States, the plaintiff never did fulfill the residential condition imposed for him by any of the statutes.

3. This is so even though the liberalizing 1940 and 1952 statutes, enacted after the plaintiff's birth, were applicable by their terms to one born abroad subsequent to May 24, 1934, the date of the 1934 Act, and were available to the plaintiff. See nn. 5 and 1, *supra.*

Thus, in summary, it may be said fairly that, for the most part, each successive statute, as applied to a foreign-born child of one United States citizen parent, moved in a direction of leniency for the child. For plaintiff Bellei the statute changed from complete disqualification to citizenship upon a condition subsequent, with that condition being expanded and made less onerous, and, after his birth, with the succeeding liberalizing provisions made applicable to him in replacement of the stricter statute in effect when he was born. The plain-

tiff nevertheless failed to satisfy any form of the condition.

## V

It is evident that Congress felt itself possessed of the power to grant citizenship to the foreign born and at the same time to impose qualifications and conditions for that citizenship. Of course, Congress obviously felt that way, too, about the two expatriation provisions invalidated by the decisions in *Schneider* and *Afroyim*.

We look again, then, at the Constitution and further indulge in history's assistance:

Of initial significance, because of its being the foundation stone of the Court's decisional structure in *Afroyim*, and, perhaps by a process of after-the-fact osmosis, of the earlier *Schneider* as well, is the Fourteenth Amendment's opening sentence:

> "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

The central fact, in our weighing of the plaintiff's claim to continuing and therefore current United States citizenship, is that he was born abroad. He was not born in the United States. He was not naturalized in the United States. And he has not been subject to the jurisdiction of the United States. All this being so, it seems indisputable that the first sentence of the Fourteenth Amendment has no application to plaintiff Bellei. He simply is not a Fourteenth-Amendment-first-sentence citizen. His posture contrasts with that of Mr. Afroyim, who was naturalized in the United States, and with that of Mrs. Schneider, whose citizenship was derivative by her presence here and by her mother's naturalization here.

The plaintiff's claim thus must center in the statutory power of Congress and in the appropriate exercise of that power within the restrictions of any pertinent constitutional provisions other than the Fourteenth Amendment's first sentence.

The reach of congressional power in this area is readily apparent:

1. Over 70 years ago the Court, in an opinion by Mr. Justice Gray, reviewed and discussed early English statutes relating to rights of inheritance and of citizenship of persons born abroad of parents who were British subjects. *United States* v. *Wong Kim Ark,* 169 U. S. 649, 668–671 (1898). The Court concluded that "naturalization by descent" was not a common-law concept but was dependent, instead, upon statutory enactment. The statutes examined were 25 Edw. 3, Stat. 2 (1350); 29 Car. 2, c. 6 (1677); 7 Anne, c. 5, § 3 (1708); 4 Geo. 2, c. 21 (1731); and 13 Geo. 3, c. 21 (1773). Later Mr. Chief Justice Taft, speaking for a unanimous Court, referred to this "very learned and useful opinion of Mr. Justice Gray" and observed "that birth within the limits of the jurisdiction of the Crown, and of the United States, as the successor of the Crown, fixed nationality, and that there could be no change in this rule of law except by statute . . . ." *Weedin* v. *Chin Bow,* 274 U. S., at 660. He referred to the cited English statutes and stated, "These statutes applied to the colonies before the War of Independence."

We thus have an acknowledgment that our law in this area follows English concepts with an acceptance of the *jus soli,* that is, that the place of birth governs citizenship status except as modified by statute.

2. The Constitution as originally adopted contained no definition of United States citizenship. However, it referred to citizenship in general terms and in varying contexts: Art. I, § 2, cl. 2, qualifications for members of the House; Art. I, § 3, cl. 3, qualifications for Senators;

Art. II, § 1, cl. 5, eligibility for the office of President; Art. III, § 2, cl. 1, citizenship as affecting judicial power of the United States. And, as has been noted, Art. I, § 8, cl. 4, vested Congress with the power to "establish an uniform Rule of Naturalization." The historical reviews in the *Afroyim* opinions provide an intimation that the Constitution's lack of definitional specificity may well have been attributable in part to the desire to avoid entanglement in the then-existing controversy between concepts of state and national citizenship and with the difficult question of the status of Negro slaves.

In any event, although one might have expected a definition of citizenship in constitutional terms, none was embraced in the original document or, indeed, in any of the amendments adopted prior to the War Between the States.

3. Apart from the passing reference to the "natural born Citizen" in the Constitution's Art. II, § 1, cl. 5, we have, in the Civil Rights Act of April 9, 1866, 14 Stat. 27, the first statutory recognition and concomitant formal definition of the citizenship status of the native born: "[A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States . . . ." This, of course, found immediate expression in the Fourteenth Amendment, adopted in 1868, with expansion to "[a]ll persons born or naturalized in the United States . . . ." As has been noted above, the amendment's "undeniable purpose" was "to make citizenship of Negroes permanent and secure" and not subject to change by mere statute. *Afroyim* v. *Rusk,* 387 U. S., at 263. See H. Flack, Adoption of the Fourteenth Amendment 88–94 (1908).

Mr. Justice Gray has observed that the first sentence of the Fourteenth Amendment was "declaratory of exist-

ing rights, and affirmative of existing law," so far as the qualifications of being born in the United States, being naturalized in the United States, and being subject to its jurisdiction are concerned. *United States* v. *Wong Kim Ark*, 169 U. S., at 688. Then follows a most significant sentence:

"But it [the first sentence of the Fourteenth Amendment] has not touched the acquisition of citizenship by being born abroad of American parents; and has left that subject to be regulated, as it had always been, by Congress, in the exercise of the power conferred by the Constitution to establish an uniform rule of naturalization."

Thus, at long last, there emerged an express *constitutional* definition of citizenship. But it was one restricted to the combination of three factors, each and all significant: birth in the United States, naturalization in the United States, and subjection to the jurisdiction of the United States. The definition obviously did not apply to any acquisition of citizenship by being born abroad of an American parent. That type, and any other not covered by the Fourteenth Amendment, was necessarily left to proper congressional action.

4. The Court has recognized the existence of this power. It has observed, "No alien has the slightest right to naturalization unless all statutory requirements are complied with . . . ." *United States* v. *Ginsberg*, 243 U. S. 472, 475 (1917). See *United States* v. *Ness*, 245 U. S. 319 (1917); *Maney* v. *United States*, 278 U. S. 17 (1928). And the Court has specifically recognized the power of Congress not to grant a United States citizen the right to transmit citizenship by descent. As hereinabove noted, persons born abroad, even of United States citizen fathers who, however, acquired American citizenship after the effective date of the 1802 Act, were aliens. Congress

responded to that situation only by enacting the 1855 statute. *Montana* v. *Kennedy,* 366 U. S., at 311. But more than 50 years had expired during which, because of the withholding of that benefit by Congress, citizenship by such descent was not bestowed. *United States* v. *Wong Kim Ark,* 169 U. S., at 673–674. Then, too, the Court has recognized that until the 1934 Act the transmission of citizenship to one born abroad was restricted to the child of a qualifying American father, and withheld completely from the child of a United States citizen mother and an alien father. *Montana* v. *Kennedy, supra.*

Further, it is conceded here both that Congress may withhold citizenship from persons like plaintiff Bellei[6] and may prescribe a period of residence in the United States as a condition *precedent* without constitutional question.[7]

Thus we have the presence of congressional power in this area, its exercise, and the Court's specific recognition of that power and of its having been properly withheld or properly used in particular situations.

## VI

This takes us, then, to the issue of the constitutionality of the exercise of that congressional power when it is used to impose the condition subsequent that confronted plaintiff Bellei. We conclude that its imposition is not unreasonable, arbitrary, or unlawful, and that it withstands the present constitutional challenge.

1. The Congress has an appropriate concern with problems attendant on dual nationality. *Savorgnan* v.

---

[6] At oral argument plaintiff's counsel conceded that "Congress need not vest a person in his position with citizenship if it chooses not to do so." Tr. of Oral Rearg. 27. Counsel for the *amici* sympathetic with the plaintiff's cause made a like concession. *Id.,* at 36.

[7] *Id.,* at 26.

*United States,* 338 U. S. 491, 500 (1950); N. Bar-Yaacov, Dual Nationality xi and 4 (1961). These problems are particularly acute when it is the father who is the child's alien parent and the father chooses to have his family reside in the country of his own nationality. The child is reared, at best, in an atmosphere of divided loyalty. We cannot say that a concern that the child's own primary allegiance is to the country of his birth and of his father's allegiance is either misplaced or arbitrary.

The duality also creates problems for the governments involved. MR. JUSTICE BRENNAN recognized this when, concurring in *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 187 (1963), a case concerning native-born citizens, he observed: "We have recognized the entanglements which may stem from dual allegiance . . . ." In a famous case MR. JUSTICE DOUGLAS wrote of the problem of dual citizenship. *Kawakita* v. *United States,* 343 U. S. 717, 723–736 (1952). He noted that "[o]ne who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting," *id.,* at 733; that one with dual nationality cannot turn that status "into a fair-weather citizenship," *id.,* at 736; and that "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship," *ibid.* The District Court in this very case conceded:

> "It is a legitimate concern of Congress that those who bear American citizenship and receive its benefits have some nexus to the United States." 296 F. Supp., at 1252.

2. There are at least intimations in the decided cases that a dual national constitutionally may be required to make an election. In *Perkins* v. *Elg,* 307 U. S. 325, 329 (1939), the Court observed that a native-born citizen

who had acquired dual nationality during minority through his parents' foreign naturalization abroad did not lose his United States citizenship "provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties." In *Kawakita* v. *United States,* 343 U. S., at 734, the Court noted that a dual national "under certain circumstances" can be deprived of his American citizenship through an Act of Congress. In *Mandoli* v. *Acheson,* 344 U. S. 133, 138 (1952), the Court took pains to observe that there was no statute in existence imposing an election upon that dual nationality litigant.

These cases do not flatly say that a duty to elect may be constitutionally imposed. They surely indicate, however, that this is possible, and in *Mandoli* the holding was based on the very absence of a statute and not on any theory of unconstitutionality. And all three of these cases concerned persons who were born here, that is, persons who possessed Fourteenth Amendment citizenship; they did not concern a person, such as plaintiff Bellei, whose claim to citizenship is wholly, and only, statutory.

3. The statutory development outlined in Part IV above, by itself and without reference to the underlying legislative history, committee reports, and other studies, reveals a careful consideration by the Congress of the problems attendant upon dual nationality of a person born abroad. This was purposeful and not accidental. It was legislation structured with care and in the light of then apparent problems.

4. The solution to the dual nationality dilemma provided by the Congress by way of required residence surely is not unreasonable. It may not be the best that could be devised, but here, too, we cannot say that it is irrational or arbitrary or unfair. Congress first has imposed

a condition precedent in that the citizen parent must have been in the United States or its possessions not less than 10 years, at least five of which are after attaining age 14. It then has imposed, as to the foreign-born child himself, the condition subsequent as to residence here. The Court already had emphasized the importance of residence in this country as the talisman of dedicated attachment, *Weedin* v. *Chin Bow*, 274 U. S., at 666–667, and said:

> "It is not too much to say, therefore, that Congress at that time [when Rev. Stat. § 1993 was under consideration] attached more importance to actual residence in the United States as indicating a basis for citizenship than it did to descent from those who had been born citizens of the colonies or of the states before the Constitution. As said by Mr. Fish, when Secretary of State, to Minister Washburn, June 28, 1873, in speaking of this very proviso, 'the heritable blood of citizenship was thus associated unmistakeably with residence within the country which was thus recognized as essential to full citizenship.' Foreign Relations of the United States, Pt. 1, 1873, p. 259." 274 U. S., at 665–666.

The same policy is reflected in the required period of residence here for aliens seeking naturalization. 8 U. S. C. § 1427 (a).

5. We feel that it does not make good constitutional sense, or comport with logic, to say, on the one hand, that Congress may impose a condition precedent, with no constitutional complication, and yet be powerless to impose precisely the same condition subsequent. Any such distinction, of course, must rest, if it has any basis at all, on the asserted "premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive," *Schneider*

v. *Rusk,* 377 U. S., at 165, and on the announcement that Congress has no "power, express or implied, to take away an American citizen's citizenship without his assent," *Afroyim* v. *Rusk,* 387 U. S., at 257. But, as pointed out above, these were utterances bottomed upon Fourteenth Amendment citizenship and that Amendment's direct reference to "persons born or naturalized in the United States." We do not accept the notion that those utterances are now to be judicially extended to citizenship not based upon the Fourteenth Amendment and to make citizenship an absolute. That it is not an absolute is demonstrated by the fact that even Fourteenth Amendment citizenship by naturalization, when unlawfully procured, may be set aside. *Afroyim* v. *Rusk,* 387 U. S., at 267 n. 23.

6. A contrary holding would convert what is congressional generosity into something unanticipated and obviously undesired by the Congress. Our National Legislature indulged the foreign-born child with presumptive citizenship, subject to subsequent satisfaction of a reasonable residence requirement, rather than to deny him citizenship outright, as concededly it had the power to do, and relegate the child, if he desired American citizenship, to the more arduous requirements of the usual naturalization process. The plaintiff here would force the Congress to choose between unconditional conferment of United States citizenship at birth and deferment of citizenship until a condition precedent is fulfilled. We are not convinced that the Constitution requires so rigid a choice. If it does, the congressional response seems obvious.

7. Neither are we persuaded that a condition subsequent in this area impresses one with "second-class citizenship." That cliché is too handy and too easy, and, like most clichés, can be misleading. That the condition subsequent may be beneficial is apparent in the light

of the conceded fact that citizenship to this plaintiff was fully deniable. The proper emphasis is on what the statute permits him to gain from the possible starting point of noncitizenship, not on what he claims to lose from the possible starting point of full citizenship to which he has no constitutional right in the first place. His citizenship, while it lasts, although conditional, is not "second-class."

8. The plaintiff is not stateless. His Italian citizenship remains. He has lived practically all his life in Italy. He has never lived in this country; although he has visited here five times, the stipulated facts contain no indication that he ever will live here. He asserts no claim of ignorance or of mistake or even of hardship. He was warned several times of the provision of the statute and of his need to take up residence in the United States prior to his 23d birthday.

We hold that § 301 (b) has no constitutional infirmity in its application to plaintiff Bellei. The judgment of the District Court is reversed.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

Less than four years ago this Court held that

> "the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional forcible destruction of his citizenship, whatever his creed, color, or race. Our holding does no more than to give to this citizen that which is his own, a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship." *Afroyim* v. *Rusk*, 387 U. S. 253, 268 (1967).

The holding was clear. Congress could not, until today, consistently with the Fourteenth Amendment enact a

law stripping an American of his citizenship which he has never voluntarily renounced or given up. Now this Court, by a vote of five to four through a simple change in its composition, overrules that decision.

The Court today holds that Congress can indeed rob a citizen of his citizenship just so long as five members of this Court can satisfy themselves that the congressional action was not "unreasonable, arbitrary," *ante,* at 831; "misplaced or arbitrary," *ante,* at 832; or "irrational or arbitrary or unfair," *ante,* at 833. My first comment is that not one of these "tests" appears in the Constitution. Moreover, it seems a little strange to find such "tests" as these announced in an opinion which condemns the earlier decisions it overrules for their resort to clichés, which it describes as "too handy and too easy, and, like most clichés, can be misleading." *Ante,* at 835. That description precisely fits those words and clauses which the majority uses, but which the Constitution does not.

The Constitution, written for the ages, cannot rise and fall with this Court's passing notions of what is "fair," or "reasonable," or "arbitrary." The Fourteenth Amendment commands:

> "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

Speaking of this very language, the Court held in *Afroyim* that no American can be deprived of his citizenship without his assent. Today, the Court overrules that holding. This precious Fourteenth Amendment American citizenship should not be blown around by every passing political wind that changes the composition of this Court. I dissent.

Bellei became an American citizen under the terms of

§ 1993 of the Revised Statutes, as amended,[1] and he has neither renounced his American citizenship nor voluntarily assented to any governmental act terminating it. He has never given any indication of wanting to expatriate himself but, rather, has consistently maintained that he wants to keep his American citizenship. In my view, the decision in *Afroyim,* therefore, requires the Court to hold here that Bellei has been unconstitutionally deprived by § 301 (b) of the Immigration and Nationality Act of 1952[2] of his right to be an American citizen. Since § 301 (b) does not take into account in any way whether the citizen intends or desires to relinquish his citizenship, that section is inevitably inconsistent with the constitutional principles declared in *Afroyim.*

The Court today holds that the Citizenship Clause of the Fourteenth Amendment has no application to Bellei. The Court first notes that *Afroyim* was essentially a case construing the Citizenship Clause of the Fourteenth Amendment. Since the Citizenship Clause declares that: "All persons born or naturalized in the United States . . . are citizens of the United States . . . ," the Court reasons that the protections against involuntary expatriation declared in *Afroyim* do not protect *all* American citizens, but only those "born or naturalized in the United States." Afroyim, the argument runs, was naturalized in this country so he was protected by the Citizenship Clause, but Bellei, since he acquired his American citizenship at birth in Italy as a foreign-born child of an American citizen, was neither born nor naturalized in the United States and, hence, falls outside the scope of the Fourteenth Amendment guarantees declared in *Afroyim.* One could hardly call this a generous reading of the

---

[1] Section 1993 of the Revised Statutes, as amended by the Act of May 24, 1934, 48 Stat. 797.

[2] 8 U. S. C. § 1401 (b).

great purposes the Fourteenth Amendment was adopted to bring about.

While conceding that Bellei is an American citizen, the majority states: "He simply is not a Fourteenth-Amendment-first-sentence citizen." Therefore, the majority reasons, the congressional revocation of his citizenship is not barred by the Constitution. I cannot accept the Court's conclusion that the Fourteenth Amendment protects the citizenship of some Americans and not others.

Indeed, the concept of a hierarchy of citizenship, suggested by the majority opinion, was flatly rejected in *Schneider* v. *Rusk,* 377 U. S. 163 (1964): "We start from the premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive." *Id.,* at 165. The Court there held that Congress could not deprive Mrs. Schneider of her citizenship, which she, like Mr. Bellei in the present case, acquired derivatively through her citizen mother. Consequently, the majority in its rush to overrule *Afroyim* must also, in effect, overrule *Schneider* as well.

Under the view adopted by the majority today, all children born to Americans while abroad would be excluded from the protections of the Citizenship Clause and would instead be relegated to the permanent status of second-class citizenship, subject to revocation at the will of Congress. The Court rejected such narrow, restrictive, and super-technical interpretations of the Citizenship Clause when it held in *Afroyim* that that Clause "was designed to, and does, protect every citizen of this Nation . . . ." 387 U. S., at 268.

*Afroyim*'s broad interpretation of the scope of the Citizenship Clause finds ample support in the language and history of the Fourteenth Amendment. Bellei was not "born . . . in the United States," but he was, constitutionally speaking, "naturalized in the United States." Although those Americans who acquire their citizenship

under statutes conferring citizenship on the foreign-born children of citizens are not popularly thought of as naturalized citizens, the use of the word "naturalize" in this way has a considerable constitutional history. Congress is empowered by the Constitution to "establish an uniform Rule of Naturalization," Art. I, § 8. Anyone acquiring citizenship solely under the exercise of this power is, constitutionally speaking, a naturalized citizen. The first congressional exercise of this power, entitled "An Act to establish an uniform Rule of Naturalization," was passed in 1790 at the Second Session of the First Congress. It provided in part:

> "And the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens: *Provided,* That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States." 1 Stat. 103, 104.

This provision is the earliest form of the statute under which Bellei acquired his citizenship. Its enactment as part of a "Rule of Naturalization" shows, I think, that the First Congress conceived of this and most likely all other purely statutory grants of citizenship as forms or varieties of naturalization. However, the clearest expression of the idea that Bellei and others similarly situated should for constitutional purposes be considered as naturalized citizens is to be found in *United States* v. *Wong Kim Ark,* 169 U. S. 649 (1898):

> "The Fourteenth Amendment of the Constitution . . . contemplates two sources of citizenship, and two only: birth and naturalization. Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law. But citizenship by birth is established by the mere

fact of birth under the circumstances defined in the Constitution. Every person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization. A person born out of the jurisdiction of the United States can only become a citizen by being naturalized, either by treaty, as in the case of the annexation of foreign territory; or by authority of Congress, exercised either by declaring certain classes of persons to be citizens, as in the enactments conferring citizenship upon foreignborn children of citizens, or by enabling foreigners individually to become citizens by proceedings in the judicial tribunals, as in the ordinary provisions of the naturalization acts." 169 U. S., at 702–703.

The Court in *Wong Kim Ark* thus stated a broad and comprehensive definition of naturalization. As shown in *Wong Kim Ark,* naturalization when used in its constitutional sense is a generic term describing and including within its meaning all those modes of acquiring American citizenship other than birth in this country. All means of obtaining American citizenship which are dependent upon a congressional enactment are forms of naturalization. This inclusive definition has been adopted in several opinions of this Court besides *United States* v. *Wong Kim Ark, supra.* Thus in *Minor* v. *Happersett,* 21 Wall. 162, 167 (1875), the Court said: "Additions might always be made to the citizenship of the United States in two ways: first, by birth, and second, by naturalization. . . . [N]ew citizens may be born or they may be created by naturalization." And in *Elk* v. *Wilkins,* 112 U. S. 94 (1884), the Court took the position that the Fourteenth Amendment

"contemplates two sources of citizenship, and two sources only: birth and naturalization. . . . Per-

sons not . . . subject to the jurisdiction of the United States at the time of birth cannot become so afterwards, except by being naturalized, either individually, as by proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired." 112 U. S., at 101–102.

Moreover, this concept of naturalization is the only one permitted by this Court's consistent adoption of the view that the Fourteenth Amendment was intended to supply a comprehensive definition of American citizenship. In an opinion written shortly after the Fourteenth Amendment was ratified, the Court stated that one of the primary purposes of the Citizenship Clause was "to establish a clear and comprehensive definition of citizenship which should declare what should constitute citizenship of the United States, and also citizenship of a State." *Slaughter-House Cases,* 16 Wall. 36, 73 (1873). In his study, The Adoption of the Fourteenth Amendment, Professor Flack similarly concluded that the Citizenship Clause "put beyond doubt and cavil in the original law, who were citizens of the United States." H. Flack, The Adoption of the Fourteenth Amendment 89 (1908). And in *Afroyim* both majority and dissenting Justices appear to have agreed on the basic proposition that the scope of the Citizenship Clause, whatever its effect, did reach *all* citizens. The opinion of the Court in *Afroyim* described the Citizenship Clause as "calculated completely to control the status of citizenship." 387 U. S., at 262. And the dissenting Justices agreed with this proposition to the extent of holding that the Citizenship Clause was a "declaration of the classes of individuals to whom citizenship initially attaches." *Id.,* at 292.

The majority opinion appears at times to rely on the argument that Bellei, while he concededly might

have been a naturalized citizen, was not naturalized "in the United States." This interpretation obviously imposes a limitation on the scope of the Citizenship Clause which is inconsistent with the conclusion expressed above that the Fourteenth Amendment provides a comprehensive definition of American citizenship, for the majority's view would exclude from the protection of that Clause all those who acquired American citizenship while abroad. I cannot accept the narrow and extraordinarily technical reading of the Fourteenth Amendment employed by the Court today. If, for example, Congress should decide to vest the authority to naturalize aliens in American embassy officials abroad rather than having the ceremony performed in this country, I have no doubt that those so naturalized would be just as fully protected by the Fourteenth Amendment as are those who go through our present naturalization procedures. Rather than the technical reading adopted by the majority, it is my view that the word "in" as it appears in the phrase "in the United States" was surely meant to be understood in two somewhat different senses: one can become a citizen of this country by being born *within* it or by being naturalized *into* it. This interpretation is supported by the legislative history of the Citizenship Clause. That clause was added in the Senate rather late in the debates on the Fourteenth Amendment, and as originally introduced its reference was to all those "born in the United States or *naturalized by the laws thereof.*" Cong. Globe, 39th Cong., 1st Sess., 2768. (Emphasis added.) The final version of the Citizenship Clause was undoubtedly intended to have this same scope. See Flack, *supra,* at 88–89.

The majority takes the position that Bellei, although admittedly a citizen of this country, was not entitled to the protections of the Citizenship Clause. I would not depart from the holding in *Afroyim* that every American

citizen has Fourteenth Amendment citizenship. Bellei, as a naturalized American, is entitled to all the rights and privileges of American citizenship, including the right to keep his citizenship until he voluntarily renounces or relinquishes it.

The Court today puts aside the Fourteenth Amendment as a standard by which to measure congressional action with respect to citizenship, and substitutes in its place the majority's own vague notions of "fairness." The majority takes a new step with the recurring theme that the test of constitutionality is the Court's own view of what is "fair, reasonable, and right." Despite the concession that Bellei was admittedly an American citizen, and despite the holding in *Afroyim* that the Fourteenth Amendment has put citizenship, once conferred, beyond the power of Congress to revoke, the majority today upholds the revocation of Bellei's citizenship on the ground that the congressional action was not "irrational or arbitrary or unfair." The majority applies the "shock-the-conscience" test to uphold, rather than strike, a federal statute. It is a dangerous concept of constitutional law that allows the majority to conclude that, because it cannot say the statute is "irrational or arbitrary or unfair," the statute must be constitutional.

Of course the Court's construction of the Constitution is not a "strict" one. On the contrary, it proceeds on the premise that a majority of this Court can change the Constitution day by day, month by month, and year by year, according to its shifting notions of what is fair, reasonable, and right. There was little need for the founders to draft a written constitution if this Court can say it is only binding when a majority finds it fair, reasonable, and right to make it so. That is the loosest construction that could be employed. It is true that England has moved along very well in the world without a written constitution. But with complete familiarity

with the English experience, our ancestors determined to draft a written constitution which the members of this Court are sworn to obey. While I remain on the Court I shall continue to oppose the power of judges, appointed by changing administrations, to change the Constitution from time to time according to their notions of what is "fair" and "reasonable." I would decide this case not by my views of what is "arbitrary," or what is "fair," but rather by what the Constitution commands.

I dissent.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS joins, dissenting.

Since the Court this Term has already downgraded citizens receiving public welfare, *Wyman* v. *James,* 400 U. S. 309 (1971), and citizens having the misfortune to be illegitimate, *Labine* v. *Vincent, ante,* p. 532, I suppose today's decision downgrading citizens born outside the United States should have been expected. Once again, as in *James* and *Labine,* the Court's opinion makes evident that its holding is contrary to earlier decisions. Concededly, petitioner was a citizen at birth, not by constitutional right, but only through operation of a federal statute. In the light of the complete lack of rational basis for distinguishing among citizens whose naturalization was carried out within the physical bounds of the United States, and those, like Bellei, who may be naturalized overseas, the conclusion is compelled that the reference in the Fourteenth Amendment to persons "born or naturalized in the United States" includes those naturalized through operation of an Act of Congress, wherever they may be at the time. Congress was therefore powerless to strip Bellei of his citizenship; he could lose it only if he voluntarily renounced or relinquished it. *Afroyim* v. *Rusk,* 387 U. S. 253 (1967). I dissent.