11-1252-ag
Morales-Santana v. Lynch

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: April 1, 2013    Final Submission: November 14, 2014
 Decided: July 8, 2015     Amended: October 30, 2015)

Docket No. 11-1252-ag

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

LUIS RAMON MORALES-SANTANA, AKA LUIS MORALES,

   *Petitioner*,

    v.

LORETTA E. LYNCH, UNITED STATES ATTORNEY GENERAL,[*]

   *Respondent*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LOHIER, CARNEY, *Circuit Judges*, and RAKOFF, *District Judge*.[**]

  Petitioner Luis Ramon Morales-Santana seeks review of a Board of
Immigration Appeals ("BIA") decision denying his motion to reopen his

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General
Loretta E. Lynch is automatically substituted for former Attorney General
Eric H. Holder, Jr. as Respondent.

[**] The Honorable Jed S. Rakoff, of the United States District Court for the
Southern District of New York, sitting by designation.

removal proceedings to evaluate his claim of derivative citizenship. Under the statute in effect when Morales-Santana was born, Immigration and Nationality Act of 1952, §§ 301(a)(7), 309(a), (c) (codified at 8 U.S.C. §§ 1401(a)(7), 1409(a), (c) (1952)), Morales-Santana's father satisfied the physical presence requirements for transmitting citizenship applicable to unwed citizen mothers but not the more stringent requirements applicable to unwed citizen fathers. On appeal, Morales-Santana argues principally that this statutory scheme violates the Fifth Amendment's guarantee of equal protection, and that the proper remedy is to extend to unwed fathers the benefits unwed mothers receive under the statute. We agree and hold that Morales-Santana derived citizenship at birth through his father. We accordingly REVERSE the BIA's decision and REMAND for further proceedings consistent with this opinion.

STEPHEN A. BROOME (Ellyde Roko and Jacob Waldman, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for* Petitioner.

IMRAN R. ZAIDI, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC (Stuart Delery, Acting Assistant Attorney General, Stephen J. Flynn, Assistant Director, Office of Immigration Litigation, Civil Division, Kathryn M. McKinney, Attorney, Office of Immigration Litigation, Civil Division, *on the brief*), *for* Respondent.

LOHIER, *Circuit Judge*:

Luis Ramon Morales-Santana asks us to review a March 3, 2011

decision of the Board of Immigration Appeals ("BIA") denying his motion to

reopen his removal proceedings relating to his claim of derivative citizenship. Under the statute in effect when Morales-Santana was born – the Immigration and Nationality Act of 1952 (the "1952 Act") – a child born abroad to an unwed citizen mother and non-citizen father has citizenship at birth so long as the mother was present in the United States or one of its outlying possessions for a continuous period of at least one year at some point prior to the child's birth. See 1952 Act, § 309(c), 66 Stat. 163, 238-39 (codified at 8 U.S.C. § 1409(c) (1952)).[1] By contrast, a child born abroad to an unwed citizen father and non-citizen mother has citizenship at birth only if the father was present in the United States or one of its outlying possessions prior to the child's birth for a period or periods totaling at least ten years, with at least five of those years occurring after the age of fourteen. See id. § 309(a) (codified at 8 U.S.C. § 1409(a) (1952)); see also id. § 301(a)(7) (codified at 8 U.S.C. § 1401(a)(7) (1952)).[2] Morales-Santana's father satisfied the

[1] Unless otherwise noted, references to §§ 1401 and 1409 are to those sections as they appear in the 1952 Act, and references to other statutory provisions are to those sections as they appear in the current codification.
[2] Section 1401(a)(7) provided:

> The following shall be nationals and citizens of the United States at birth: . . . a person born outside the geographical limits of the United

requirements for transmitting citizenship applicable to unwed mothers but not the more stringent requirements applicable to unwed fathers. On appeal, Morales-Santana argues principally that this gender-based difference violates the Fifth Amendment's guarantee of equal protection and that the proper remedy is to extend to unwed fathers the benefits unwed mothers receive under § 1409(c). We agree and hold that Morales-Santana derived citizenship at birth through his father. We accordingly REVERSE the BIA's decision and REMAND for further proceedings consistent with this opinion.

---

> States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years . . . .

Section 1409(a) provided that § 1401(a)(7) "shall apply as of the date of birth to a child born out of wedlock on or after the effective date of this Act," provided that paternity is established "by legitimation" before the child turns 21. Section 1409(c) provided:

> Notwithstanding the provision of subsection (a) of this section, a person born, on or after the effective date of this Act, outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

4

**BACKGROUND**

I. <u>Facts</u>

The following undisputed facts are drawn from the record on appeal.

Morales-Santana's father, Jose Dolores Morales, was born in Puerto Rico on March 19, 1900 and acquired United States citizenship in 1917 pursuant to the Jones Act. <u>See</u> Jones Act of Puerto Rico, ch. 145, 39 Stat. 951 (codified at 8 U.S.C. § 1402 (1917)). He was physically present in Puerto Rico until February 27, 1919, 20 days before his nineteenth birthday, when he left Puerto Rico to work in the Dominican Republic for the South Porto Rico Sugar Company.

In 1962 Morales-Santana was born in the Dominican Republic to his father and his Dominican mother. Morales-Santana was what is statutorily described as "legitimat[ed]" by his father upon his parents' marriage in 1970 and admitted to the United States as a lawful permanent resident in 1975. 8 U.S.C. § 1409(a). Morales-Santana's father died in 1976.

II. <u>Statutory Framework</u>

Unlike citizenship by naturalization, derivative citizenship exists as of a child's birth or not at all. <u>See</u> 8 U.S.C. § 1409(a), (c); <u>cf. id.</u> § 1101(a)(23). The law in effect at the time of birth governs whether a child obtained derivative

citizenship as of his or her birth.  See Ashton v. Gonzales, 431 F.3d 95, 97 (2d Cir. 2005).  Accordingly, the 1952 Act provides the statutory framework applicable to Morales-Santana's nationality claim.

As noted, the 1952 Act limits the ability of an unwed citizen father to confer citizenship on his child born abroad – where the child's mother is not a citizen at the time of the child's birth – more stringently than it limits the ability of a similarly situated unwed citizen mother to do the same.  Compare 8 U.S.C. § 1401(a)(7), with id. § 1409(c).[3]  We note that this difference in treatment of unwed citizen fathers and unwed citizen mothers, though diminished, persists in the current statute.  Compare 8 U.S.C. § 1409(a) (2012) (applying to unwed citizen fathers § 1401(g), which requires five years of physical presence, two of which must be after age fourteen), with id. § 1409(c) (maintaining the 1952 Act's conferral of derivative citizenship based on an

---

[3] In addition to satisfying the requirements of § 1401(a)(7), the father must establish his paternity through legitimation of the child before the child turns 21.  See 8 U.S.C. § 1409(a).  As both parties agree, Morales-Santana's father legitimated his son in 1970.  Morales-Santana does not contest the statute's legitimation requirement, and that requirement is not at issue on appeal.  See Nguyen v. INS, 533 U.S. 53 (2001) (upholding as constitutional the similar legitimation requirement found in the current version of the statute, 8 U.S.C. § 1409(a)(4) (2000)).

6

unwed mother's continuous physical presence for one year at any time prior to the child's birth).

III. Procedural History

In 2000 Morales-Santana was placed in removal proceedings after having been convicted of various felonies. He applied for withholding of removal on the basis of derivative citizenship obtained through his father. An immigration judge denied the application. In 2010 Morales-Santana filed a motion to reopen based on a violation of equal protection and newly obtained evidence relating to his father. The BIA rejected Morales-Santana's arguments for derivative citizenship and denied his motion to reopen.

**DISCUSSION**

Morales-Santana makes four arguments for derivative citizenship: (1) that his father's physical absence from the United States during the 20 days directly prior to his father's nineteenth birthday constituted a de minimis "gap" in physical presence, and that such gaps should not count against a finding of physical presence for purposes of § 1401(a)(7); (2) that the South Porto Rico Sugar Company, which employed his father after his father moved to the Dominican Republic, was a multi-national United States-owned

7

company and therefore effectively part of the United States government or an international organization as defined in 22 U.S.C. § 288, see 1966 Act to Amend the Immigration and Nationality Act (the "1966 Act"), 80 Stat. 1322 (codified at 8 U.S.C. § 1401(a)(7) (1966)) (counting periods of employment for certain organizations toward the statute's physical presence requirements); (3) that at the time his father moved to the Dominican Republic it was an "outlying possession" of the United States; and (4) as noted, that the different physical presence requirements applicable to unwed fathers and unwed mothers under the 1952 Act violate equal protection.

Consistent with our obligation to avoid constitutional questions if possible, we first address Morales-Santana's three statutory arguments for derivative citizenship. See Escambia Cnty., Fla. v. McMillan, 466 U.S. 48, 51 (1984) (per curiam).

As to both his statutory and constitutional arguments, we review de novo the question of Morales-Santana's derivative citizenship. See Phong Thanh Nguyen v. Chertoff, 501 F.3d 107, 111 (2d Cir. 2007). "If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about

8

the petitioner's nationality is presented, the court shall decide the nationality claim."  8 U.S.C. § 1252(b)(5)(A).  No material facts are disputed.

I.  Statutory Arguments

Morales-Santana contends that his father's absence from the United States during the 20 days prior to his father's nineteenth birthday constitutes a de minimis "gap" in his father's physical presence and that such gaps should not be held against someone who claims to have satisfied the 1952 Act's physical presence requirement.  In support, Morales-Santana points to continuous physical presence requirements under the immigration laws that explicitly excuse de minimis absences.  See, e.g., id. § 1229b(b)(1)(A), (d)(2) (2012) (absences of 90 continuous days or fewer do not break "continuity" of physical presence for purposes of cancellation of removal for a lawful permanent resident.); id. §§ 1255(l)(3), 1255a(a)(3)(B).  By its plain terms, § 1401(a)(7) had no similar exception.  In any event, because Morales-Santana's father left the United States and its outlying possessions 20 days prior to his nineteenth birthday and never returned, there was no "gap" in his father's physical presence that bridged two periods of physical presence.  So even if we recognized an exception to the physical presence requirement in

§ 1401 for de minimis "gaps," we would reject Morales-Santana's claim on this basis.

Relying on the 1966 Act, Morales-Santana next argues that his father's employment with the South Porto Rico Sugar Company in the Dominican Republic immediately after leaving Puerto Rico satisfied the statute's physical presence requirement by effectively continuing his physical presence through the requisite period. It is true that the 1966 Act provided that employment with the United States Government or with an international organization, as defined in 22 U.S.C. § 288, satisfied the physical presence requirement. See 8 U.S.C. § 1401(a)(7) (1966). But Morales-Santana's argument lacks merit because his father's employment with the South Porto Rico Sugar Company, a multinational company, did not constitute employment with the United States Government. See Drozd v. INS, 155 F.3d 81, 86 (2d Cir. 1998). Nor did it constitute employment with an international organization as defined in 22 U.S.C. § 288, since the South Porto Rico Sugar Company was neither "a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress

authorizing such participation or making an appropriation for such participation," nor "designated by the President" as such. 22 U.S.C. § 288.

As his final statutory argument, Morales-Santana contends that the Dominican Republic was an "outlying possession" of the United States for purposes of the 1952 Act when Morales-Santana's father was there in 1919. Two factors convince us that Congress did not intend to include the Dominican Republic within the scope of the term "outlying possession" in § 1401.[4]

First, there is no treaty or lease pursuant to which the Dominican Republic was acquired. This stands in contrast to the Philippines, Guam, Puerto Rico, and the U.S. Virgin Islands, all of which were acquired by the United States by treaty, see Treaty of Peace between the United States and the Kingdom of Spain, 30 Stat. 1754 (1899); Convention between the United States and Denmark, 39 Stat. 1706 (1917), and all of which were outlying possessions when the United States exercised sovereignty over them, see Matter of V-, 9 I.

---

[4] Congress did not define "outlying possessions" until the Nationality Act of 1940, which defined "outlying possessions" as "all territory . . . over which the United States exercises rights of sovereignty, except the Canal Zone." See § 101(e), 54 Stat. 1137 (codified at 8 U.S.C. § 501(e) (1940)). The 1952 Act defined the term to include only "American Samoa and Swains Island." 101(a)(29), 66 Stat. 170 (codified at 8 U.S.C. § 1101(a)(29) (1952)).

11

& N. Dec. 558, 561 (1962); Matter of Y-----, 7 I. & N. Dec. 667, 668 (1958).  The case of Guantanamo Bay, Cuba is a little different in that it involves both a lease and a treaty, but it yields the same result vis-à-vis the Dominican Republic.  In Boumediene v. Bush, 553 U.S. 723 (2008), the Supreme Court determined that the "complete jurisdiction and control" by the United States over Guantanamo Bay constituted "de facto" sovereignty over it.  Id. at 753-55 (quotation marks omitted).  The Court added, though, that in a 1903 Lease Agreement between Cuba and the United States, the former granted the latter "complete jurisdiction and control" over Guantanamo Bay and that "[u]nder the terms of [a] 1934 [t]reaty, . . . Cuba effectively has no rights as a sovereign until the parties agree to modification of the 1903 Lease Agreement or the United States abandons" Guantanamo Bay.  Id. at 753.  By contrast, there is no lease or treaty that conferred to the United States de facto or de jure sovereignty over the Dominican Republic.

Second, we acknowledge the historical fact that the United States exercised significant control during its military occupation of the Dominican Republic from 1916 to 1924.  See Ingenio Porvenir C. Por A. v. United States, 70 Ct. Cl. 735, 738 (1930).  But that control did not extinguish the sovereignty

12

of the Dominican Republic. Indeed, the Proclamation of the Military Occupation of Santo Domingo by the United States specifically declared that the purpose of the temporary military occupation was "to give aid to [the Dominican Republic] in returning to a condition of internal order" without "destroying the sovereignty of" the Dominican Republic. 11 Supp. Am. J. Int'l L. 94, 94-96 (1917) (Nov. 29, 1916 Proclamation); see also Bruce J. Calder, The Impact of Intervention: The Dominican Republic During the U.S. Occupation of 1916-1924 xxvii, 17, 205 (2d ed. 2006).

Having rejected Morales-Santana's statutory arguments for derivative citizenship, we now consider his constitutional equal protection argument.

II. Equal Protection

Morales-Santana argues principally that the 1952 Act's treatment of derivative citizenship conferral rights violates the Fifth Amendment's guarantee of equal protection.[5] As we have explained, under the 1952 Act, an

---

[5] Morales-Santana has standing to assert this equal protection claim on behalf of his father since Morales-Santana alleges that his father suffered an injury in fact, that his father bears a close relation to him, and that his father's ability to assert his own interests is hindered because his father is deceased. See Campbell v. Louisiana, 523 U.S. 392, 397 (1998) (citing Powers v. Ohio, 499 U.S. 400, 411 (1991)); see also Miller v. Albright, 523 U.S. 420, 433 (1998)

unwed citizen mother confers her citizenship on her child (born abroad to a non-citizen biological father) so long as she has satisfied the one-year continuous presence requirement prior to the child's birth. The single year of presence by the mother can occur at any time prior to the child's birth – including, for example, from the mother's first birthday until her second birthday. An unwed citizen father, by contrast, faces much more stringent requirements under 8 U.S.C. §1409(a), which incorporates § 1401(a)(7). He is prevented from transmitting his citizenship (to his child born abroad to a non-citizen mother) unless he was physically present in the United States or an outlying possession prior to the child's birth for a total of at least ten years.[6] Because five of those years must follow the father's fourteenth birthday, an unwed citizen father cannot transmit his citizenship to his child born abroad to a non-citizen mother before the father's nineteenth birthday. Eighteen-year-old citizen fathers and their children are out of luck.

---

(opinion of Stevens, J.); id. at 449-50 (O'Connor, J., concurring); id. at 454 n.1 (Scalia, J., concurring); id. at 473 (Breyer, J., dissenting).

[6] As noted, the father must also satisfy a legitimation requirement. See 8 U.S.C. § 1409(a).

As both parties agree, had Morales-Santana's mother, rather than his father, been a citizen continuously present in Puerto Rico until 20 days prior to her nineteenth birthday, she would have satisfied the requirements to confer derivative citizenship on her child. It is this gender-based difference in treatment that Morales-Santana claims violated his father's right to equal protection.

The Government asserts that the difference is justified by two interests: (1) ensuring a sufficient connection between citizen children and the United States, and (2) avoiding statelessness. In what follows, we apply intermediate scrutiny to assess these asserted interests, and we conclude that neither interest is advanced by the statute's gender-based physical presence requirements. After determining that these physical presence requirements violate equal protection, we apply the statute's severance clause and determine that Morales-Santana, under the statute stripped of its constitutional defect, has citizenship as of his birth.

### A. Level of Scrutiny

We apply intermediate, "heightened" scrutiny to laws that discriminate on the basis of gender. United States v. Virginia, 518 U.S. 515, 531-33 (1996).

15

Under intermediate scrutiny, the government classification must serve actual and important governmental objectives, and the discriminatory means employed must be substantially related to the achievement of those objectives. Nguyen v. INS, 533 U.S. 53, 68 (2001); Virginia, 518 U.S. at 533. Furthermore, the justification for the challenged classification "must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." Virginia, 518 U.S. at 533.

In urging us to apply rational basis scrutiny instead, the Government relies on Fiallo v. Bell, 430 U.S. 787 (1977). In Fiallo, the Supreme Court applied rational basis scrutiny to a section of the 1952 Act that gave special preference for admission into the United States to non-citizens born out of wedlock seeking entry by virtue of a relationship with their citizen mothers, but not to similarly situated non-citizens seeking entry by virtue of a relationship with their citizen fathers. See id. at 798. The Court reasoned that rational basis scrutiny was warranted because "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens," and "[o]ur cases have long recognized the power to expel or

16

exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments." Id. at 792 (emphases added) (quotation marks omitted); see also Kleindienst v. Mandel, 408 U.S. 753, 766 (1972) (Congress has "plenary power" to make rules for the admission and exclusion of non-citizens. (quotation marks omitted)).

But Fiallo is distinguishable. In Fiallo, the children's alienage implicated Congress's "exceptionally broad power" to admit or remove non-citizens. Fiallo, 430 U.S. at 794. Here, by contrast, there is no similar issue of alienage that would trigger special deference. Because Morales-Santana instead claims pre-existing citizenship at birth, his challenge does not implicate Congress's "power to admit or exclude foreigners," id. at 795 n.6, and therefore is not governed by Fiallo.

Our view of Fiallo's limited scope is grounded in Supreme Court and circuit caselaw. As an initial matter, we note that the Supreme Court has never applied the deferential Fiallo standard to issues of gender discrimination under § 1409, despite being asked to do so on at least three occasions. See Miller v. Albright, 523 U.S. 420 (1998) (declining to apply Fiallo); Nguyen v. INS, 533 U.S. 53 (2001) (applying heightened scrutiny);

17

United States v. Flores-Villar, 131 S. Ct. 2312 (2011) (per curiam) (affirming without opinion by divided 4-4 vote). Justice Stevens' opinion in Miller succinctly described Fiallo's limitation: "It is of significance that the petitioner in this case, unlike the petitioners in Fiallo, . . . is not challenging the denial of an application for special [immigration] status. She is contesting the Government's refusal to . . . treat her as a citizen. If she were to prevail, the judgment . . . would confirm her pre-existing citizenship." Miller, 523 U.S. at 432 (opinion of Stevens, J.); see also id. at 429 ("Fiallo . . . involved the claims of . . . aliens to a special immigration preference, whereas here petitioner claims that she is, and for years has been, an American citizen.").

Although no opinion in Miller received a majority of votes, we observed in Lake v. Reno that "seven justices in Miller would have applied heightened scrutiny . . . [to INA] section 309(a)." 226 F.3d 141, 148 (2d Cir. 2000), vacated sub nom. Ashcroft v. Lake, 533 U.S. 913 (2001) (citing Nguyen), abrogated on other grounds by Lake v. Ashcroft, 43 F. App'x 417, 418 (2d Cir. 2002). Later, in Lewis v. Thompson, we explained Lake's holding in a way that makes it clear that heightened scrutiny, rather than Fiallo's more deferential standard of review, should apply to Morales-Santana's claim:

18

"[W]e have already held in Lake, drawing an inference from the various opinions of the Justices in Miller, that citizen claimants with an equal protection claim deserving of heightened scrutiny do not lose that favorable form of review simply because the case arises in the context of immigration." 252 F.3d 567, 591 (2d Cir. 2001); see also id. at 590 ("As we recognized in Lake, Fiallo itself made clear that the reduced threshold of justification for governmental action that applied to immigrants did not apply to citizens." (emphasis added) (quotation marks omitted)).  Our sister circuits that have considered Fiallo's application to claims similar to Morales-Santana's are in accord.  See Nguyen v. INS, 208 F.3d 528, 535 (5th Cir. 2000) (noting that "the statute in Fiallo dealt with the claims of aliens for special immigration preferences for aliens, whereas the petitioner's claim in this case is that he is a citizen"), aff'd, 533 U.S. 53 (2001); Breyer v. Meissner, 214 F.3d 416, 425 (3d Cir. 2000) (applying heightened scrutiny to § 1993 of the Revised Statutes of 1874, a predecessor to § 1409,  because it "created a gender classification with respect to [petitioner's] mother's ability to pass her citizenship to her foreign-born child at his birth"); United States v. Ahumada-Aguilar, 189 F.3d 1121, 1126 (9th Cir. 1999) (applying Miller to "f[i]nd § 1409(a)(4) unconstitutional by

19

applying heightened scrutiny"), vacated, 533 U.S. 913 (2001) (citing Nguyen), abrogated on other grounds by 295 F.3d 943 (9th Cir. 2002); cf. United States v. Flores-Villar, 536 F.3d 990, 996 n.2 (9th Cir. 2008) ("Like the Supreme Court in Nguyen, we will assume that intermediate scrutiny applies."), aff'd by an equally divided Court, 131 S. Ct. 2312.

For these reasons, we conclude that the gender-based scheme in §§ 1401 and 1409 can be upheld only if the Government shows that it is substantially related to an actual and important governmental objective. See Virginia, 518 U.S. at 531, 533, 535-36; Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982). In assessing the validity of the gender-based classification, moreover, we consider the existence of gender-neutral alternatives to the classification. See, e.g., Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 151 (1980); Orr v. Orr, 440 U.S. 268, 281 (1979); Weinberger v. Wiesenfeld, 420 U.S. 636, 653 (1975).

B. Governmental Interests and Tailoring

Having determined that intermediate scrutiny applies, we examine the two interests that the Government claims support the statute's gender-based distinction.

20

### 1. Ensuring a Sufficient Connection Between the Child and the United States

The Government asserts that Congress passed the 1952 Act's physical presence requirements in order to "ensur[e] that foreign-born children of parents of different nationalities have a sufficient connection to the United States to warrant citizenship." Respondent's Br. 38-39. As both parties agree, this interest is important, and Congress actually had it in mind when requiring some period of physical presence before a citizen parent could confer citizenship on his or her child born abroad. See Petitioner's Br. 35 n.17 (citing Weedin v. Chin Bow, 274 U.S. 657, 666-67 (1927)).

The Government invokes this important interest but fails to justify the 1952 Act's different treatment of mothers and fathers by reference to it. It offers no reason, and we see no reason, that unwed fathers need more time than unwed mothers in the United States prior to their child's birth in order to assimilate the values that the statute seeks to ensure are passed on to citizen children born abroad.

We recognize that our determination conflicts with the decision of the Ninth Circuit in Flores-Villar, 536 F.3d 990, which addressed the same statutory provisions and discussed the same governmental interest in

21

ensuring a connection between child and country. The Ninth Circuit concluded that in addition to preventing or reducing statelessness – an objective we address below – "[t]he residence differential . . . furthers the objective of developing a tie between the child, his or her father, and this country." Flores-Villar, 536 F.3d at 997. The Ninth Circuit provided no explanation for its conclusion, and the Government provides none here.

Instead, the Government relies on Nguyen to explain why the different physical presence requirements for unwed men and women reflect a concern with ensuring an adequate connection between the child and the United States. We are not persuaded. In Nguyen, the Court upheld the Immigration and Nationality Act's requirement that a citizen father seeking to confer derivative citizenship on his foreign-born child take the affirmative step of either legitimating the child, declaring paternity under oath, or obtaining a court order of paternity.[7] See Nguyen, 533 U.S. at 62; 8 U.S.C. § 1409(a)(4) (2000). The Nguyen Court determined that two interests supported the legitimation requirement for citizen fathers of children born abroad.

---

[7] For brevity, we refer to these as constituting a "legitimation requirement," though legitimation is just one of three ways of satisfying the statutory provision.

22

The first interest, "assuring that a biological parent-child relationship exists," Nguyen, 533 U.S. at 62; see Miller, 523 U.S. at 435-36, is irrelevant to the 1952 Act's physical presence requirements because derivative citizenship separately requires unwed citizen fathers to have legitimated their foreign-born children. Here, Morales-Santana's father established his biological tie to Morales-Santana by legitimating him. His physical presence in Puerto Rico for ten years as opposed to one year prior to Morales-Santana's birth would have provided no additional assurance that a biological tie existed.

The Nguyen Court identified a second interest in ensuring "that the child and the citizen parent have some demonstrated opportunity or potential to develop" a "real, meaningful relationship." Nguyen, 533 U.S. at 64-65. The Court explained that a biological mother, by virtue of giving birth to the child, "knows that the child is in being and is hers," but that an unwed biological father might in some cases not even "know that a child was conceived, nor is it always clear that even the mother will be sure of the father's identity." Id. at 65. Rather than requiring a case-by-case analysis of whether a father or a mother has a "real, meaningful relationship" with a child born abroad, "Congress enacted an easily administered scheme to promote the different

23

but still substantial interest of ensuring at least an opportunity for a parent-child relationship to develop." Id. at 69. This interest in ensuring the "opportunity for a real, meaningful relationship" between parent and child is likewise not relevant to the 1952 Act's physical presence requirements. By legitimating his son, Morales-Santana's father took the affirmative step of demonstrating that an opportunity for a meaningful relationship existed. And again, requiring that Morales-Santana's father be physically present in Puerto Rico prior to Morales-Santana's birth for ten years instead of one year would have done nothing to further ensure that an opportunity for such a relationship existed.

So we agree that unwed mothers and fathers are not similarly situated with respect to the two types of parent-to-child "ties" justifying the legitimation requirement at issue in Nguyen. But unwed mothers and fathers are similarly situated with respect to how long they should be present in the United States or an outlying possession prior to the child's birth in order to have assimilated citizenship-related values to transmit to the child. Therefore, the statute's gender-based distinction is not substantially related to

the goal of ensuring a sufficient connection between citizen children and the United States.

### 2.  Preventing Statelessness

Having concluded that the Government's interest in establishing a connection between the foreign-born child and the United States does not explain or justify the gender-based distinction in the 1952 Act's physical presence requirements, we now turn to the Government's other asserted interest.  The Government argues that Congress enacted different physical presence requirements in § 1409(a) (incorporating § 1401(a)(7)) and § 1409(c) to reduce the level of statelessness among newborns.  For example, a child born out of wedlock abroad may be stateless if he is born inside a country that does not confer citizenship based on place of birth and neither of the child's parents conferred derivative citizenship on him.

The avoidance of statelessness is clearly an important governmental interest.  See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 160-61 (1963); Trop v. Dulles, 356 U.S. 86, 102 (1958) (plurality opinion).  Contrary to the Government's claim, though, avoidance of statelessness does not appear to have been Congress's actual purpose in establishing the physical presence

requirements in the 1952 Act, see Virginia, 518 U.S. at 533, and in any event the gender-based distinctions in the 1952 Act's physical presence requirements are not substantially related to that objective.

### a. Actual Purpose

Some historical background is useful to understand Congress's purpose in establishing the 1952 Act's gender-based physical presence requirements. Until 1940, a citizen father whose child was born abroad transmitted his citizenship to that child if the father had resided in the United States for any period of time prior to the child's birth. See Rogers v. Bellei, 401 U.S. 815, 823-25 (1971) (discussing the Act of March 26, 1790, 1 Stat. 103, and successive statutes); Act of May 24, 1934, ch. 344, 48 Stat. 797; Nationality Act of 1940 (the "1940 Act"), ch. 876, § 201(g), 54 Stat. 1137, 1139. Consistent with common law notions of coverture, and with the notion that the husband determined the political and cultural character of his dependents (wife and children included), prior to 1934 married women had no statutory right to confer their own citizenship.[8] See Brief [of] Amici Curiae of Professors of History,

---

[8] In 1934 Congress granted citizen mothers, whether married or unmarried, the right to confer citizenship on their children born abroad if the mother

26

Political Science, and Law in Support of Petitioner at 9, Flores-Villar v. United States, 131 S. Ct. 2312 (2010), 2010 WL 2602009; Candice Lewis Bredbenner, A Nationality of Her Own: Women, Marriage, and the Law of Citizenship 84 (1998).  But for unmarried citizen mothers, the State Department's practice since at least 1912 was to grant citizenship to their foreign-born children on the theory that an unmarried mother "stands in the place of the father" and is in any event "bound to maintain [the child] as its natural guardian."  To Revise and Codify the Nationality Laws of the United States Into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization, 76th Cong. 431 (1945) (quotation marks omitted).

In 1940 Congress for the first time explicitly addressed the situation of children born out of wedlock.  It enacted Section 205 of the 1940 Act, 54 Stat. at 1139-40, which provided that citizen fathers and married citizen mothers could transmit citizenship to their child born abroad only after satisfying an age-calibrated ten-year physical presence requirement, but that unmarried citizen mothers could confer citizenship if they had resided in the United

satisfied the same minimal residency requirement applicable to citizen fathers.  See Act of May 24, 1934, ch. 344, § 1, 48 Stat. 797.

27

States at any point prior to the child's birth. The 1952 Act retained this basic statutory structure, though it imposed a somewhat more stringent requirement that unmarried mothers have been physically present in the United States for a continuous period of one year in order to confer citizenship. 8 U.S.C. § 1409(c).

Neither the congressional hearings nor the relevant congressional reports concerning the 1940 Act contain any reference to the problem of statelessness for children born abroad.[9] The congressional hearings concerning the 1952 Act are similarly silent about statelessness as a driving concern.[10] Notwithstanding the absence of relevant discussion concerning the

---

[9] Cf. Kristin A. Collins, Illegitimate Borders: *Jus Sanguinis* Citizenship and the Legal Construction of Family, Race, and Nation, 123 Yale L.J. 2134, 2205 n.283 (2014) ("[I]n the many hundreds of pre-1940 administrative memos I have read that defend or explain recognition of the nonmarital foreign-born children of American mothers as citizens, I have identified exactly one memo by a U.S. official that mentions the risk of statelessness for the foreign-born nonmarital children of American mothers as a concern." (citing Memorandum from Green Hackworth, Office of the Solicitor, U.S. Dep't of State, to Richard Flournoy, Office of the Solicitor, U.S. Dep't of State (Aug. 14, 1928) (on file with National Archives and Records Administration, Relevant Group 59, Central Decimal File 131))).

[10] The Government does cite one congressional report in which statelessness was mentioned in conjunction with the 1952 Act. A Senate Report dated January 29, 1952 mentions the problem of statelessness in explaining why the

28

problem of statelessness for children born abroad in the legislative history,

the Government points to the Executive Branch's explanatory comments to

Section 204 of the proposed nationality code that Congress would ultimately

enact as the 1940 Act.  See 76th Cong. 431.  These comments refer to a 1935

law review article entitled A Comparative Study of Laws Relating to

Nationality at Birth and to Loss of Nationality, 29 Am. J. Int'l L. 248 (1935), by

Durward V. Sandifer.[11]  According to the article, in 1935 approximately thirty

---

1952 Act eliminated a provision in the 1940 Act that had conditioned a citizen
mother's ability to transmit nationality to her child on the father's failure to
legitimate the child prior to the child's eighteenth birthday.  See 1940 Act,
§ 205, 54 Stat. at 1140 ("In the absence of . . . legitimation or adjudication
[during the child's minority], . . . the child" born abroad to an unmarried
citizen mother "shall be held to have acquired at birth [the mother's]
nationality status." (emphases added)).  The 1952 Act eliminated this
provision, allowing the mother to transmit citizenship independent of the
father's actions.  S. Rep. No. 1137, at 39 (1952) ("This provision establishing
the child's nationality as that of the [citizen] mother regardless of legitimation
or establishment of paternity is new.  It insures that the child shall have a
nationality at birth." (emphasis added)).

     Although the Report reflects congressional awareness of statelessness
as a problem, it does not purport to justify the gender-based distinctions in
the physical presence provisions at issue in this appeal.

[11] Contrary to the Government's assertion, the Sandifer article does not
indicate that it was "conducted by the State Department."  Rather, Sandifer,
who worked at the State Department at the time he wrote the article, explains
at the outset that he decided to write it at the suggestion of a colleague, not

countries had statutes assigning children born out of wedlock the citizenship of their mother.  Id. at 258.  From the comments and the article, the Government urges us to infer that "Congress was aware" there existed "a substantial risk that a child born to an unwed U.S. citizen mother in a country employing [laws determining citizenship based on lineage, rather than place of birth] would be stateless at birth unless the mother could pass her citizenship to her child," and that this risk was "unique" to the children of unwed citizen mothers.  Respondent's May 8, 2013 Supp. Br. 2, 6-7.[12]

Based on our review of the Executive Branch's explanatory comments and the Sandifer article, we decline the Government's invitation.  The explanatory comments do not mention statelessness and do not refer to the Sandifer article's discussion of statelessness.  In any event, the Sandifer article itself does not support the Government's argument that the children of

---

pursuant to an official directive.  See Sandifer, Comparative Study, 29 Am. J. Int'l L. at 248.

[12] In response to our order requesting supplemental briefing on the issue, the Government was unable to furnish any other evidence that Congress enacted or the Executive encouraged the 1940 Act's or the 1952 Act's gender-based physical presence requirements due to concerns about statelessness.

unwed citizen mothers faced a greater risk of statelessness than the children of unwed citizen fathers.

While the Executive Branch's comments ignore the problem of statelessness, they arguably reflect gender-based generalizations concerning who would care for and be associated with a child born out of wedlock. [13] Other contemporary administrative memoranda similarly ignore the risk of statelessness for children born out of wedlock abroad to citizen mothers.[14]

In sum, we discern no evidence (1) that Congress enacted the 1952 Act's gender-based physical presence requirements out of a concern for statelessness, (2) that the problem of statelessness was in fact greater for

---

[13] The comments reflect the view that the mother "is bound to maintain" "custody and control of . . . a child [born out of wedlock] as against the putative father" as its "natural guardian" and that "[t]he mother, as guardian by nurture, has the right to the custody and control of her bastard child." 76th Cong. 431 (quotation marks omitted); see also Collins, 123 Yale L.J. at 2205 ("[T]he historical record reveals that the pronounced gender asymmetry of the [1940] Nationality Act's treatment of nonmarital foreign-born children of American mothers and fathers was shaped by contemporary maternalist norms regarding the mother's relationship with her nonmarital child – and the father's lack of such a relationship."); id. at 2203 (quoting as representative of contemporary views an internal letter to a State Department official stating that "as a practical matter, it is well known that almost invariably it is the mother who concerns herself with [the nonmarital] child").

[14] See Collins, 123 Yale L.J. at 2205 n.283.

children of unwed citizen mothers than for children of unwed citizen fathers, or (3) that Congress believed that the problem of statelessness was greater for children of unwed citizen mothers than for children of unwed citizen fathers. We conclude that neither reason nor history supports the Government's contention that the 1952 Act's gender-based physical presence requirements were motivated by a concern for statelessness, as opposed to impermissible stereotyping.

b.     Substantial Relationship Between Ends and Means

Even assuming for the sake of argument that preventing statelessness was Congress's actual motivating concern when it enacted the physical presence requirements, we are persuaded by the availability of effective gender-neutral alternatives that the gender-based distinction between § 1409(a) (incorporating § 1401(a)(7)) and § 1409(c) cannot survive intermediate scrutiny.  See Wengler, 446 U.S. at 151 (invalidating a gender-based classification where a gender-neutral approach would serve the needs of both classes); Orr, 440 U.S. at 282-83 ("A gender-based classification which, as compared to a gender-neutral one, generates additional benefits only for those it has no reason to prefer cannot survive equal protection scrutiny.").

As far back as 1933, Secretary of State Cordell Hull proposed just such a gender-neutral alternative in a letter to the Chairman of the House Committee on Immigration and Naturalization. Secretary Hull suggested that the immigration laws be revised "to obtain the objective of parity between the sexes in nationality matters" by "remov[ing] . . . discrimination between" mothers and fathers "with regard to the transmission of citizenship to children born abroad." Hull proposed the following language:

> PROPOSED AMENDMENT . . .
>
> (d) A child hereafter born out of wedlock beyond the limits and jurisdiction of the United States and its outlying possessions to an American parent who has resided in the United States and its outlying possessions, there being no other legal parent under the law of the place of birth, shall have the nationality of such American parent.

Letter from Sec'y Hull to Chairman Dickstein (Mar. 27, 1933) (Respondent's May 8, 2013 Supp. Br. Ex. B).[15]

And unlike the legitimation requirement at issue in Nguyen, which could be satisfied by, for example, "a written acknowledgment of paternity

---

[15] In 1936, an Executive Branch official who participated in drafting the 1940 Act recognized that "Section 204 [of the 1940 Act] as drawn up by the Committee slightly discriminates in favor of women." Letter from John J. Scanlon to Ruth B. Shipley, U.S. Dep't of State (Mar. 7, 1936) (Petitioner's Nov. 14, 2014 Supp. Br. Ex. 4); see also Collins, 123 Yale L.J. at 2235.

under oath," the physical presence requirement that Morales-Santana challenges imposes more than a "minimal" burden on unwed citizen fathers. See Nguyen, 533 U.S. at 70-71. It adds to the legitimation requirement ten years of physical presence in the United States, five of which must be after the age of fourteen. In our view, this burden on a citizen father's right to confer citizenship on his foreign-born child is substantial.[16]

For these reasons, the gender-based distinction at the heart of the 1952 Act's physical presence requirements is not substantially related to the achievement of a permissible, non-stereotype-based objective.[17]

---

[16] As we have already noted, the burden is actually impossible for eighteen-year-old unwed citizen fathers to satisfy.

[17] We note once more that our conclusion differs from that of the Ninth Circuit in Flores-Villar. There the Ninth Circuit assumed, sub silentio, that Congress's enactment of the physical presence requirements was actually motivated by concern for reduction in the risk of statelessness. It also nominally assumed, without deciding, that intermediate scrutiny applied. See 536 F.3d at 996 & n.2. We disagree with the Ninth Circuit that the Government has carried its burden of showing an "exceedingly persuasive justification" for the statute's gender-based classification as a means of addressing the problem of statelessness. See Kirchberg v. Feenstra, 450 U.S. 455, 461 (1981). The Government has not shown that the problem arose – or was perceived to arise – more often with citizen mothers than with citizen fathers of children born out of wedlock abroad. See, e.g., Sandifer, Comparative Study, 29 Am. J. Int'l L. at 254; Brief of Amici Curiae Scholars on

34

### 3. Remedy

We now turn to the most vexing problem in this case. Here, two statutory provisions – § 1409(c) and (a)[18] – combine to violate equal protection. What is the remedy for this violation of equal protection, where citizenship is at stake? Ordinarily, "when the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." Heckler v. Mathews, 465 U.S. 728, 740 (1984) (emphasis omitted) (quoting Iowa-Des Moines Nat'l Bank v. Bennett, 284 U.S. 239, 247 (1931)); accord Califano v. Westcott, 443 U.S. 76, 89 (1979).

As we see it, "equal treatment" might be achieved in any one of three ways: (1) striking both § 1409(c) and (a) entirely; (2) severing the one-year continuous presence provision in § 1409(c) and requiring every unwed citizen parent to satisfy the more onerous ten-year requirement if the other parent

---

Statelessness in Support of Petitioner, Flores-Villar v. United States, 131 S. Ct. 2312 (2010), 2010 WL 2569160.

[18] Recall that § 1409(a) incorporates the physical presence requirement from § 1401(a)(7), which applies to married parents of mixed citizenship.

lacks citizenship; or (3) severing the ten-year requirement in §§ 1409(a) and 1401(a)(7) and requiring every unwed citizen parent to satisfy the less onerous one-year continuous presence requirement if the other parent lacks citizenship. In selecting among these three options, we look to the intent of Congress in enacting the 1952 Act. See Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 292 n.31 (1987) ("[T]he Court must look to the intent of the . . . legislature to determine whether to extend benefits or nullify the statute."). For reasons we explain below, we conclude that the third option is most consistent with congressional intent.

We eliminate the first option with ease. The 1952 Act contains a severance clause that provides: "If any particular provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act . . . shall not be affected thereby." 1952 Act § 406; cf. Nguyen, 533 U.S. at 72 ("[S]everance is based on the assumption that Congress would have intended the result."). The clause makes clear that only one of the provisions in § 1409, rather than both, should be severed as constitutionally infirm. It also means that our holding, which relates only to

the application of these provisions to unmarried parents, should not be construed to affect the physical presence requirement for married parents.

We reject the second option – contracting, as opposed to extending, the right to derivative citizenship – with more circumspection. The Government urges us to adopt this option, arguing that the alternative allows the exception for unwed mothers to swallow the rule, thereby inflicting more damage to the statute's language and structure and reflecting a more radical change than the 1952 Congress intended. This argument fails for two reasons. First, the argument misunderstands our task, which is not to devise the "cleanest" way to alter the wording and structure of the statute, but to determine what result Congress intended in the event the combined statutory provisions were deemed unconstitutional. Second, the Government's argument neglects the historical background against which Congress enacted the relevant provisions. Although a close call, history does not convince us that the members of Congress passing the 1952 Act would have viewed the extension of the one-year requirement as a more radical change than the alternative, in which all unwed citizen parents must satisfy the ten-year age-calibrated requirement if the other parent lacks citizenship. To the contrary,

the ten-year requirement for fathers and married mothers imposed by Congress in 1940 appears to have represented a significant departure from long-established historical practice. See Rogers, 401 U.S. at 823-26 (reviewing the history of derivative citizenship statutes from the Act of March 26, 1790, 1 Stat. 103, through the 1952 Act and concluding that "for the most part, each successive statute, as applied to a foreign-born child of one United States citizen parent, moved in a direction of leniency for the child"). From 1934 until the enactment of the 1940 Act, for example, women had the statutory right to confer citizenship on their foreign-born children and were required merely to have resided in the United States for any duration prior to the child's birth. The same bare-minimum requirement applied to men for the vast majority of the time since the founding, from 1790 until 1940. See id.; Weedin, 274 U.S. at 664-67; Act of May 24, 1934, ch. 344, § 1993, 48 Stat. 797; 1940 Act. Moreover, the 1952 Act's addition of a one-year continuous physical presence requirement for unmarried citizen mothers represented a relatively minor change in the baseline minimal residency requirement applicable to all men and women prior to 1940. On the other hand, of course, we recognize that the 1952 Congress, presumably with the benefit of this long

38

history, nevertheless decided to retain the ten-year residency requirement. Whether this related to the emergence of the United States as a world power after World War II or an increasing number of children born of mixed-nationality parents, or some other set of factors, we cannot tell with confidence.

Neither the text nor the legislative history of the 1952 Act is especially helpful or clear on this point, and ultimately what tips the balance for us is the binding precedent that cautions us to extend rather than contract benefits in the face of ambiguous congressional intent. See, e.g., Westcott, 443 U.S. at 89 ("In previous cases involving equal protection challenges to underinclusive federal benefits statutes, this Court has suggested that extension, rather than nullification, is the proper course." (citing Jimenez v. Weinberger, 417 U.S. 628, 637-38 (1974), and Frontiero v. Richardson, 411 U.S. 677, 691 n.25 (1973) (plurality opinion))); Heckler, 465 U.S. at 738, 739 n.5; Weinberger, 420 U.S. at 641-42, 653; Soto-Lopez v. N.Y.C. Civil Serv. Comm'n, 755 F.2d 266, 280-81 (2d Cir. 1985). Indeed, we are unaware of a single case in which the Supreme Court has contracted, rather than extended, benefits when curing an equal protection violation through severance.

Lastly, the Government contends that, in giving Morales-Santana the relief he seeks, we are granting citizenship, which we lack the power to do. This argument rests on a mistaken premise. Although courts have no power to confer "citizenship on a basis other than that prescribed by Congress," Miller, 523 U.S. at 453 (Scalia, J., concurring), Morales-Santana has not asked us to confer citizenship, and we do not do so. Instead, Morales-Santana asks that we exercise our traditional remedial powers "so that the statute, free of its constitutional defect, can operate to determine whether citizenship was transmitted at birth." Nguyen, 533 U.S. at 95-96 (O'Connor, J., dissenting) (citing Miller, 523 U.S. at 488-89 (Breyer, J., dissenting)); cf. id. at 73-74 (Scalia, J., concurring). In other words, if Morales-Santana "were to prevail, the judgment in [his] favor would confirm [his] pre-existing citizenship rather than grant [him] rights that [he] does not now possess." Miller, 523 U.S. at 432 (opinion of Stevens, J.). Correcting the constitutional defect here would at a minimum entail replacing the ten-year physical presence requirement in § 1401(a)(7) (and incorporated within § 1409(a)) with the one-year continuous presence requirement in § 1409(c).[19] The alternative remedy suggested by the

---

[19] When applied to unmarried parents, § 1401(a)(7) as modified would read:

40

Government – that all unwed parents be subject to the more onerous ten-year requirement – would prove no less controversial: we have no more power to strip citizenship conferred by Congress than to confer it. Nor, finally, has Congress authorized us to avoid the question. <u>See</u> 8 U.S.C. § 1252(b)(5)(A) ("If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court <u>shall</u> decide the nationality claim." (emphasis added)). Conforming the immigration laws Congress enacted with the Constitution's guarantee of equal protection, we conclude that Morales-Santana is a citizen as of his birth.

---

a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a <u>continuous period of one year</u>: <u>Provided</u>, That any periods of honorable service in the Armed Forces of the United States by such citizen parent may be included in computing the physical presence requirements of this paragraph.

(first emphasis added to reflect change).

## CONCLUSION

For the foregoing reasons, we REVERSE the BIA's decision and REMAND for further proceedings consistent with this opinion.